470 So.2d 924 (1985)
Oscar LANCLOS, Plaintiff-Appellant,
v.
ROCKWELL INTERNATIONAL CORP., et al., Defendants-Appellees.
No. 83-1116.
Court of Appeal of Louisiana, Third Circuit.
May 15, 1985.
Rehearing Denied June 27, 1985.
*927 Bruce Gaudin, Opelousas, for plaintiff-appellant-appellee.
Guglielmo and Lopez, James Guglielmo, Opelousas, for intervenor-appellee.
Charles Boudreaux, Sr., Lafayette, for defendant-appellee-appellant.
Before DOMENGEAUX, GUIDRY and KNOLL, JJ.
KNOLL, Judge.
The plaintiff, Oscar Lanclos, and the intervenor, Indiana Lumberman's Mutual Insurance Company, the workman's compensation carrier for Mr. Lanclos's employer, Grand Coteau Woodworks, Inc., appeal a jury verdict rejecting Lanclos's strict products liability claim against Rockwell International Corporation (hereafter Rockwell) and its insurer, the Travelers Insurance Company (hereafter Travelers), for the loss of his four fingers and one-half of his thumb from his right hand while he was operating a Rockwell Heavy Duty Wood Shaper. Lanclos sued Rockwell, the manufacturer of the wood shaper, and its insurer, Travelers, alleging that the shaper was inherently dangerous, the cutting blades were not properly guarded, and the manufacturer failed to warn of the shaper's dangerous characteristics.
Indiana Mutual intervened seeking recovery from Rockwell and Travelers for all workman's compensation benefits it paid to Lanclos. The jury returned a general verdict rejecting Lanclos's claim against Rockwell and Travelers. Lanclos and Indiana Mutual assign as error the following:
1. The jury committed manifest error by failing to find: (a) that the Rockwell Heavy Duty Wood Shaper was defectively designed; (b) that the wood shaper did not meet industry standards; (c) that Rockwell breached its continuing duty to provide safety devices; (d) that Rockwell had a duty to warn of non-apparent dangers; (e) that Mr. Lanclos was free from fault in using the shaper; and (f) that Mr. Lanclos had not assumed the risk of operating the wood shaper.
2. The trial judge erred in instructing the jury concerning contributory negligence, comparative negligence, and assumption of the risk.
Lanclos further requests that we award and fix the amount of damages due him. The central issues presented are whether: (1) Rockwell had a duty to warn; (2) the wood shaper was defectively designed; and (3) Lanclos's fault is a bar to or operates as a reduction of his recovery. We reverse for the following reasons.

FACTS
Grand Coteau Woodworks is a milling corporation that builds custom-designed cabinets, floors, paneling, molding, doors and various other wood products. The wood shaper at issue is a versatile milling tool that Grand Coteau Woodworks purchased from a Rockwell distributor in 1970 or 1971. It is not disputed that Rockwell failed to warn or caution Grand Coteau Woodworks of the dangerous features of the wood shaper when it was designed and manufactured in 1967. The accident occurred at approximately 11:00 a.m. on December 12, 1980, while Lanclos was making *928 custom-built French doors on the Rockwell Heavy Duty Wood Shaper.
The wood shaper is electrically powered and capable of making a large variety of cuts in wood. The wood cuts are made by exposed circular cutting blades attached to a spindle located in the center of the rectangular shaper. The shaper blades rotate at approximately 10,000 r.p.m. (almost 90 m.p.h.). Wooden guide rails are placed on either side (left and right) of the blades, and are used as a backboard to firmly press the wood against so that a uniform pattern of cuts is made as the wood is passed through the cutting blades. In this particular case three blades had been stacked on the spindle to cut a pattern of multiple cuts in the narrow ends of the wood stock.
The day before the accident Lanclos straightened and cut the lumber that was to be used to construct the sixteen French doors on an electric saw. On the morning of the accident he and his helper, John Allen, ran the long pieces through the wood shaper with an automatic feeder. This automatic feeder is a mechanism not manufactured by Rockwell which was attached to the shaper; the automatic feeder permitted the wood to be carried through the shaper blades without having the operator manually hold the wood as it was passed along the guide rail through the shaper's cutting blades. The long eight-foot pieces of the French doors were shaped without trouble.
At the time of the accident Lanclos and his helper were shaping the thirty-two short components of the French doors, each 15¾ inches long by 4 1/8 inches wide with a thickness of ½ inch. When Lanclos first began this segment of the operation he had to abandon the use of the automatic feeder because the short pieces were not being uniformly fed through the shaping blades. Because cleanly patterned, uniform designs are essential to custom wood-working, Lanclos had to pass the wood through the shaper blades manually.
Lanclos was standing to the front right of the shaper. He would take the pieces of unshaped wood from a stack on the floor to the right of the shaper. With both hands, Lanclos would grasp each piece of wood at the rear corners, hold each piece on the shaper worktop firmly against the guide rails, and push the wood through the rapidly rotating cutting blades. His helper stood to the left side of the shaper and would pick up the shaped pieces of wood and stack them on the floor to the left of the shaper. Lanclos successfully repeated this process twelve times. On the return of his hand to pick up the next piece of wood to be shaped, Lanclos's right hand made contact with the shaper blades traumatically amputating his fingers and one-half of his thumb.

DUTY TO WARN
Lanclos contends that Rockwell knew the wood shaper was a dangerous instrument capable of causing severe injury, and therefore had a duty to adequately warn users about those hazards.
It is undisputed that there were no warnings or instructions affixed to the shaper.
A manufacturer must give warning of any danger inherent in its product's normal use which is not within the knowledge of any ordinary user. Chappuis v. Sears Roebuck & Co., 358 So.2d 926 (La. 1978); Hebert v. Brazzel, 403 So.2d 1242 (La.1981). In the present case we find the danger was open and obvious. The record provides sufficient basis for a reasonable trier-of-fact to conclude that Lanclos was aware of the obvious danger of having his hand contact the revolving shaping blades. Lanclos has failed to show any non-apparent hazard which would have required a written warning.

SHAPER DEFECT
Lanclos contends that the Rockwell Heavy Duty Shaper was an inherently dangerous and defective machine because the operator is not guarded from the cutting blades. He argues that Rockwell was aware of this design defect when the shaper was manufactured in 1967, and even *929 though it then had the engineering capability to guard the cutting heads, it nonetheless failed to provide a safety guard. Rockwell's defense is that the danger of the cutting blades are open and obvious, and further, because of the necessity in the shaping process to have the blades exposed to the wood, the shaper blades can not be completely guarded.
A manufacturer of a product may be held liable for injuries caused by their product, without any particular act of negligence being proven, if a plaintiff shows: (1) that the product was in normal use; (2) there was a defect in the product, i.e., the product was unreasonably dangerous in that use; and (3) that the plaintiff's injuries were caused by the defect. Defenses to a products liability claim include the negative of any of the three items above plus plaintiff's assumption of the risk. Oatis v. Catalytic, Inc., 433 So.2d 328 (La.App. 3rd Cir.1983), writs denied, 441 So.2d 210 and 441 So.2d 215; Weber v. Fidelity & Casualty Insurance Company of N.Y., 259 La. 599, 250 So.2d 754 (La.1971).
If the product is proven defective by reason of its hazard to normal use, the plaintiff does not need to prove any particular negligence by the manufacturer. Weber, supra, 250 So.2d at 756.
"Unreasonably dangerous" means simply that the article which injured the plaintiff was dangerous to an extent beyond that which would be contemplated by an ordinary consumer. DeBattista v. Argonaut-Southwest Ins. Co., 403 So.2d 26 (La.1981). Even though use of the term "unreasonably dangerous" serves to prevent the manufacturer from being treated as an insurer of its products, that term does not burden the injured plaintiff with proof of an element of negligence. DeBattista, supra, at 31.
In Entrevia v. Hood, 427 So.2d 1146 (La.1983), the Supreme Court stated:
"The unreasonable risk of harm criterion, however, is not a simple rule of law which may be applied mechanically to the facts of a case. It is a concept employed by this court to symbolize the judicial process required by the civil code.
* * * * * *

As this court has noted in relation to other forms of strict liability under the civil code, the activities of man for which he may be liable without acting negligently are to be determined after a study of the law and customs, a balancing of claims and interests, a weighing of the risk and the gravity of harm, and a consideration of individual and societal rights and obligations. Langlois v. Allied Chemical Corporation, 258 La. 1067, 1084, 249 So.2d 133, 140 (1971).

The judicial process involved in deciding whether a risk is unreasonable under Article 2317 is similar to that employed in determining whether a risk is unreasonable in a traditional negligence problem, Hunt v. City Stores Inc., 387 So.2d 585 (La.1980), and in deciding the scope of duty or legal cause under the duty/risk analysis. Hill v. Lundin Associates, Inc., 260 La. 542, 256 So.2d 620 (1972); Green, The Causal Relation Issue, 60 Mich.L.Rev. 543, 563 (1962). This is not because strict liability under Article 2317 is equivalent to liability for negligence, but because in both delictual areas the judge is called upon to decide questions of social utility that require him to consider the particular case in terms of moral, social, and economic considerations, in the same way that the legislator finds the standards or patterns of utility and morals in the life of the community. B. Cardozo, The Nature of the Judicial Process, at p. 105 (1921); See also, Green, The Causal Relation Issue, 60 Mich.L.Rev. 543 (1962)."

The strict products liability doctrine serves two basic goals: (1) by providing an incentive for manufacturers to produce safer products, the incidence of injuries is reduced; (2) by allocating the burden of accidental injuries caused by defective products on those who market them, it is treated as a production cost against which *930 liability insurance is obtainable. Restatement Second of Torts § 402A; Bell v. Jet Wheel Blast, Div. of Ervin Ind., 462 So.2d 166 (La.1985).
It is undisputed that the Rockwell shaper is a dangerous tool, that Lanclos was making normal use of the wood shaper at the time of the accident, and that there was nothing improper with the manner in which he was performing the woodworking operation.
It was the consensus of opinion among the engineering experts at trial, and at oral argument it was conceded, that Lanclos's four fingers and thumb were not traumatically amputated while he was pushing the wood through the shaper blades. Rather, Lanclos was injured after the piece of wood passed through the blades. During the backstroke to his right, his right hand contacted the top blades as he was picking up the next piece of unshaped wood stacked on his right.
For the following reasons, we find that the jury erred in failing to find Rockwell's design of the wood shaper defective.
A design that presents unreasonable hazards within the range of the equipment's forseeable uses imposes an additional duty on the designer-manufacturer to provide adequate guards against those hazards. Straley v. Calongne Drayage & Storage, Inc., 346 So.2d 171 (La.1977).
Lanclos was injured while performing a repetitive operation with a machine which exposed the operator to unguarded shaper blades. Further, as the wood was shaped the vibrations from the shaper blades numbed Lanclos's hands which caused him to take breaks to restore feeling in his fingers. And further, the wooden guide rails did not function as a guard because they offered the operator no protection against hand intrusion from above the blades.
Rockwell was aware of this shaper design problem in 1967 when the shaper was manufactured. The evidence shows that the woodworking industry recognized the necessity for guarding and, as early as 1954, the "United States Standard Code for Woodworking Machinery" provided in § 4.6.1 as follows:
"4.6 Wood Shapers, etc.
4.6.1 Guarding of Cutting Heads
(a) The cutting heads of each wood shaper, hand-fed panel raiser, or other similar machine not automatically fed, shall be enclosed with a cage or adjustable guard so designed as to keep the operator's hands away from the cutting edge. The diameter of circular shaper guards shall be not less than the greatest diameter of the cutter. In no case shall a warning device of leather or other material attached to the spindle be acceptable."
This standard was affirmed in 1971 in the "American National Standard Safety Requirements for Woodworking Machinery" § 6.6.1, and was adopted verbatim in O.S. H.A. requirement 1910.213, n. (1). From at least the 1960s Rockwell was represented on the advisory committee which adopted the American National Standards. Therefore, Rockwell can not now argue that it was not aware of the need to guard wood shaper blades.
Nevertheless, it was not until 1977 that Rockwell marketed Safe Guard II, a relatively inexpensive disc which fits just above the shaper blades and offers a shield to keep the operator's hands away from the cutters. Rockwell touted Safe Guard II as "the safer way to shape," and described it in its advertisements as providing minimum exposure of the operator to the shaper blades. Rockwell's experts also testified that Safe Guard II presented no new design innovations and the material of which it was constructed had been in existence since the mid to late 1960s; conceptually they agreed that Rockwell possessed the technology in 1967 to have developed a similar guard.
Rockwell argued that it did not know who owned their machine and, therefore, it could not let owners know of the new guard. This defense ignores that Rockwell has a continuing duty to provide *931 safety devices as they become available. They could have published advertisements in trade journals advising owners and operators of this added safety feature. Cf. Winterrowd v. The Travelers Indemnity Company, et al., 462 So.2d 639 (La.1985). The record is void of any attempt to let shaper owners know of the availability of this inexpensive blade guard.
Rockwell attempted to establish that an automatic feeding device is the best guard against shaper injuries. An automatic feeder is not a manufactured component part of the Rockwell shaper, and it is not available as an accessory from Rockwell. Furthermore, at the time of the accident, Lanclos did not have an automatic feeder available which could perform the shaping operation. Rockwell did not advise the shaper operator to only use the Rockwell shaper in conjunction with an automatic feeder. Therefore Rockwell had a duty to guard the shaper blades when an automatic feeder could not be utilized.
Rockwell further contends that a universal guard can not be developed for the wood shaper because of the great versatility of the machine. It argues that the operator is in the best position to build shop guards for each woodworking operation. Because a guard can not be developed for all possible shaping operations, Rockwell is not alleviated of its duty to at least provide the shaper operator with protection for general shaping operations, particularly since the risk of injury to the user is so great and the effect of injury irreversible. Certainly Safe Guard II would have provided such general protection. Similarly, Rockwell can not delegate to the operator its duty to adequately design its product with guards. The manufacturer is in the best position, economically and technologically, to provide such general protection, and to advise the operator to take additional precautions in those operations it does not consider it can guard.
We find that the jury was manifestly erroneous if it found that Rockwell's heavy duty shaper was not unreasonably dangerous. Lanclos was performing a highly repetitive task involving short pieces of wood being manually fed through cutting blades revolving at approximately 90 m.p.h. We therefore conclude that the Rockwell Heavy Duty Shaper was defective because the shaper blades were not guarded. The evidence is conclusive that the Safe Guard II would have provided Lanclos with the protection from such an injury as did occur.

DEFENSES
Lanclos argues that the trial judge erred in instructing the jury concerning contributory negligence, comparative negligence and assumption of risk. Rockwell contends that Lanclos assumed the risk of injury because he was an experienced carpenter operating a wood shaper whose danger was open and obvious.
Our review of the record reveals no reference in the trial judge's instructions to contributory negligence or comparative fault. Instead the trial court restricted its discussion to the question of victim fault which it likened to the defense of assumption of risk.
Assumption of risk is a question of fact determined by an evaluation of the plaintiff's subjective knowledge in each case. Dorry v. Lafleur, 399 So.2d 559 (La.1981). The proof required for the application of the assumption of risk defense consists of three elements: (1) the plaintiff must have actual knowledge of the dangerous condition; (2) there must be appreciation of its dangerous quality; and (3) there must be a voluntary assumption of the danger. Dorry, supra.
In discussing assumption of risk the Supreme Court in Dorry referred to The Restatement, Second, Torts, Section 496D as follows:
"`Except where he expressly so agrees, a plaintiff does not assume a risk of harm arising from the defendant's conduct unless he then knows of the existence of the risk and appreciates its unreasonable character.'

*932 Comment b. explains:

`The basis of assumption of risk is the plaintiff's consent to accept the risk and look out for himself. Therefore, he will not be found, in the absence of an express agreement which is clearly so to be construed, to assume any risk unless he has knowledge of its existence. This means that he must not only be aware of the facts which create the danger, but must also appreciate the danger itself and the nature, character and extent which make it unreasonable. Thus the condition of premises upon which he may enter may be quite apparent to him, but the danger arising from the condition may be neither known nor apparent, or if known or apparent at all, it may appear to him to be so slight as to be negligible. In such a case the plaintiff does not assume the risk. His failure to exercise due care either to discover or understand the danger is not properly a matter of assumption of risk, ...'"
Applying the elements delineated in Dorry, supra, to the present case, we conclude that Lanclos did not assume the risk of his injury. Lanclos used the Rockwell heavy duty shaper only once before. In his work as a general carpenter Lanclos used a wood shaper only casually: when he constructed his daughter's home he used a small consumer model wood shaper, which he owned, to do some of the trim work; and when he was working for a building contractor he used a wood shaper to make special trim for a shopping center. However, none of Lanclos's experience as a general carpenter involved heavy duty wood shapers and the repetitive wood shaping operations which he performed at the time of his injury. Likewise, although Lanclos was a carpenter for many years, he worked as a custom-design woodworker for less than six months. His carpentry experience focused on the construction of homes and buildings, not the detailed finished work of making custom-designed doors and cabinets.
Lanclos's testimony and that of the employees and owners of Grand Coteau Woodworks, Inc. was that they were unaware of the Safe Guard II. They further testified that because of the shortness of the wooden door components being shaped at the time of the accident, the automatic feeder and the miter guage could not be used because neither held the wood firmly against the guide rails. Therefore, under these circumstances, Lanclos did not knowingly assume the risk of operating the Rockwell Heavy Duty Wood Shaper.
Although the trial court neither instructed the jury on the availability of contributory negligence as a defense in products liability cases, nor discussed whether the doctrine of comparative fault was applicable, we feel required to briefly address these issues since Rockwell pleaded both defenses in its answer to Lanclos's petition for damages.
In Bell, supra, the Supreme Court rejected the defense of contributory negligence as a complete bar to recovery in a products liability case and allowed comparative fault in certain cases to reduce the plaintiff's recovery. Whether comparative fault is applicable in a products liability case must be decided on a case by case basis. Bell, supra; McCaskill v. Welch, 463 So.2d 942 (La.App. 3rd Cir.1985), writ denied, 466 So.2d 469 (La.1985). According to Bell, whether comparative fault is applicable as a defense in products liability cases must be determined in light of the policy considerations which form the basis of the products liability doctrine. The Supreme Court stated in Bell:

"Where the threat of a reduction in recovery will provide consumers with an incentive to use a product carefully, without exacting an inordinate sacrifice of other interests, comparative principles should be applied for the sake of accident prevention. The recovery of a plaintiff who has been injured by a defective product should not be reduced, however, in those types of cases in which it does not serve realistically to promote careful product use or where it drastically reduces the *933 manufacturer's incentive to make a safer product."

In light of the policy considerations enumerated in Bell, we conclude that comparative fault was not available as a defense in the case sub judice. Lanclos's use of the heavy duty wood shaper was repetitive and was that of a reasonably prudent man. His hand was traumatically injured on the backstroke of the hand because of the lack of a guard at the exposed shaper blades. His ordinary contributory negligence in combination with the machine's defect caused the accident and injury. Under these circumstances, comparative fault would not realistically serve to promote careful use of the industrial wood shaper and it would drastically reduce Rockwell's incentive to manufacture a safer product. Reduction of Lanclos's award in this type of case would only tend to defeat the basic goals of strict products liability doctrine by reducing economic incentive for product quality control. The imposition of a duty on the manufacturer to make the machine safe to operate whether by installing a guard or by making it inoperable without a guard, means that the law does not accept the employee's ability to take care of himself as an adequate safeguard of interests which society seeks to protect. Bell, supra.
In summation, the jury was manifestly erroneous in concluding either (or both) that the Rockwell Shaper was not unreasonably dangerous in normal use, or that Lanclos assumed the risk in operating the Rockwell Shaper. Accordingly, we find that Oscar Lanclos is entitled to recover from Rockwell International Corporation, the manufacturer of the shaper, and its insurer, the Travelers Insurance Company.

QUANTUM
Lanclos urges us to award damages for his injuries. Since the entire record is before us, and a remand for the sole purpose of assessing damages would only serve to further delay the final outcome of this litigation, we shall determine the damages due Lanclos. Gonzales v. Xerox Corporation, 320 So.2d 163 (La.1975).
Lanclos was 55 years of age at the time of the accident and had no formal education beyond the seventh grade. He is right handed. From 1950 to mid-1980 he worked as a carpenter constructing houses and buildings; sometimes he worked for various construction companies and other times he worked on his own. On July 14, 1980, Lanclos was employed by Grand Coteau Woodworks, Inc. custom building cabinets and doors at an hourly rate of $6.00; at the time of the accident he was shortly due a raise to $7.00 an hour. He worked 40-43 hours per week and was paid time and one-half for overtime work.
Lanclos was given emergency treatment at Opelousas General Hospital immediately following the accident, and transferred to Lafayette General Hospital where he was hospitalized until December 18, 1980. Dr. Louis Mes, a plastic surgeon, performed surgery to trim the bones, nerves and damaged skin of Lanclos's traumatically damaged right hand, and attempted to salvage the remaining joint of Lanclos's right index finger. Dr. Mes loosely closed the wound to permit it to drain into thick bandages. On December 17, 1980, the attempt to save part of Lanclos's right index finger proved unsuccessful and Dr. Mes amputated it.
Dr. Mes continued treating Lanclos after his discharge from the hospital and saw Lanclos at his office once or twice a week for the first several months. On March 6, 1981, Dr. Mes performed additional hand surgery to trim scar tissue which remained after healing began. After this treatment Lanclos continued to suffer pain in his damaged hand, and on April 24, 1981, Dr. Mes again performed hand surgery to excise nerves which remained imbedded in scar tissue on the surface of the skin. Dr. Mes discharged Lanclos on November 13, 1981, nearly a year after the accident, because there was no further medical treatment which could be rendered.
At trial Lanclos explained that because of the loss of the fingers of his right hand: he has difficulty bathing and dressing; he *934 can not swing a hammer or use a wrench or screwdriver; and he can not push a lawn mower with his right hand. Further he testified that his right hand is painful, especially in cold weather and whenever it is bumped.
It is incumbent upon the tortfeasor to establish that the injured victim is able to work after the accident. Holmes v. Texaco, Inc., 422 So.2d 1302 (La.App. 5th Cir. 1982). Since the accident Lanclos has been unable to work. Dr. Mes described Lanclos's disability as anatomic and permanent. He further opined that even with reconstructive surgery, Lanclos could not operate machinery because his right hand would be, at best, only useful as a support hand. Furthermore, Rockwell has made no showing that Lanclos could perform any labor since the accident, even outside Lanclos's field of experience.
Jonathan S. Wood was the only economist to testify concerning Lanclos's lost wages, past and future. From the data he was provided, he concluded that: Lanclos was 55.6 years of age at the time of the accident and had a work life expectancy of 8.1 years; between the date of the accident and trial approximately 2.5 years had elapsed; from the date of trial he had a work life expectancy of 5.6 years; based on an hourly rate of $6, he was earning $12,800 annually at the time of the accident; and an individual's income increases annually from 0% to as high as 6%.
There was direct testimony, however, from Acadian Woodworks that Lanclos was due a raise of one dollar an hour commencing January of 1981. We, therefore, base our award on this $7 per hour figure. See: Naylor v. La. Dept. of Public Highways, 423 So.2d 674 (La.App. 1st Cir.1982), writs denied, 429 So.2d 127 (La.1983) and 429 So.2d 134 (La.1983). Judging from the pay increase Lanclos was about to receive, we also use an income growth figure of 6% annually. Accordingly, we find between the accident date and the time of trial Lanclos lost wages amounting to $36,400.
In arriving at an award for loss of future earnings, we must consider all of the facts and circumstances, and award an amount which is just and fair to both litigants. Viator v. Gilbert, 253 La. 81, 216 So.2d 821 (1968). Loss of future earnings can not be calculated with absolute certainty and damages for loss of future earnings are speculative. Robinson v. Graves, 343 So.2d 147 (La.1977). Factors which we may consider in assessing awards of impairment of earning capacity are age, life expectancy, work life expectancy, investment income factor, productivity increase, prospects for rehabilitation, probable future earning capacity, loss of future earning capacity, loss of earning ability, and inflation. Unbehagen v. Bollinger Workover, Inc., 411 So.2d 507 (La.App. 1st Cir. 1982). After considering all the facts we are of the opinion that $82,432.03 is a fair award for Lanclos's loss of future earnings for 5.6 years.
It was stipulated at trial that Lanclos's medical expenses amounted to $7,251.20. We conclude that Lanclos is entitled to recover this sum.
The evidence indicates that Lanclos was involved in four surgical procedures to his hand. Dr. Mes photographed Lanclos's right hand immediately before the initial surgery and later after the hand healed. These pictures were referred to in Dr. Mes's testimony and were introduced into evidence. Lanclos continues to suffer pain in the hand. Accordingly, we find that Lanclos is entitled to receive an award of $150,000 for disfigurement, pain and suffering.

INTERVENTION
Indiana Mutual, Grand Coteau's workman's compensation carrier, intervened seeking preferential payment for all amounts paid on behalf of Lanclos prior to the date the judgment became final. See Billeaud v. United States Fidelity & Guaranty Co., 349 So.2d 1379 (La.App. 3rd Cir.1977). It was stipulated that Indiana *935 Mutual paid the following to or on Lanclos's behalf:

Medical expenses $7,251.20
Workman's compensation benefits $53,223.00
 __________
TOTAL $60,474.20

Judgment in favor of intervenor will be awarded accordingly.

DECREE
Therefore, for the foregoing reasons, the judgment of the trial court is reversed, and IT IS ORDERED, ADJUDGED, AND DECREED that there be judgment in favor of Oscar Lanclos, and against Rockwell International Corporation and the Travelers Insurance Company, jointly, severally and in solido in the full sum of $276,083.23 plus legal interest from the date of judicial demand until paid.
IT IS FURTHER ORDERED, ADJUDGED AND DECREED that there be judgment in favor of intervenor, Indiana Mutual Insurance Company, and against Rockwell International Corporation and the Travelers Insurance Company, jointly, severally and in solido in the full sum Indiana Mutual Insurance Company has actually paid, which totals $60,474.20 or will pay prior to the satisfaction of this judgment, to or on behalf of Oscar Lanclos as workman's compensation benefits to be paid to Indiana Mutual Insurance Company by preference and priority out of the principal sum awarded herein to Oscar Lanclos.
All costs of the trial court and this appeal are assessed to Rockwell International Corporation and the Travelers Insurance Company.
REVERSED AND RENDERED.

ORDER
PER CURIAM.
In our original decision we awarded the intervenor, Indiana Lumberman's Mutual Insurance Company, $60,474.20. We acknowledge that the intervenor is incorrectly referred to as Indiana Mutual Insurance Company in our decree. Furthermore, we inadvertently failed to award Indiana Lumberman's Mutual Insurance Company legal interest on its award from date of judicial demand until paid. Since the intervenor prayed for legal interest in its petition, by law the intervenor is entitled to legal interest. Breaux v. Roy Young, Inc., 397 So.2d 1384 (La.App. 3rd Cir.1981). Accordingly, we hereby amend our decree to correctly reflect the name of intervenor as Indiana Lumberman's Mutual Insurance Company and to award Indiana Lumberman's Mutual Insurance Company legal interest on the award of $60,474.20 from the date of judicial demand until paid. Otherwise, the applications for rehearing are denied and our original decree is affirmed.