613 So.2d 1097 (1993)
Albert David JENKINS, et ux., Plaintiffs-Appellees,
v.
KERR-McGEE CORPORATION, et al., Defendants-Appellants.
No. 92-48.
Court of Appeal of Louisiana, Third Circuit.
February 3, 1993.
Writ Denied April 23, 1993.
*1099 Robert C. Thomas, Natchitoches, for plaintiffs-appellees.
Wood Brown, III, New Orleans, for defendants-appellants.
Roy, Carmouche, Bivins, Judice, Henke & Breaud, Robert A. Mahtook, Jr., Lafayette, for defendant.
Before GUIDRY, STOKER and COOKS, JJ.
GUIDRY, Judge.
This suit arose from an accident which occurred on an offshore oil drilling platform. Plaintiff, Albert Jenkins, injured his neck on July 17, 1988 while working as a Safety and Training Specialist (STS) aboard Transworld Drilling Company rig number 64 in the Gulf of Mexico. He and his wife, Faye Jenkins, sued his employer, Transworld Drilling Company (Transworld), and Kerr-McGee Corporation which, at the time, owned Transworld. Plaintiffs alleged that they were entitled to damages for negligence under the Jones Act and for unseaworthiness of the drilling rig under general maritime law. After a bench trial, the court ruled that Jenkins was a Jones Act seaman, found Transworld negligent under the Jones Act, and rendered judgment in favor of Albert Jenkins only and against Transworld only in the amount of $775,246.31 plus legal interest. The trial court dismissed plaintiffs' claim under general maritime law concluding that the vessel was not unseaworthy. The sum awarded was made subject to an $8,177.18 credit in favor of Transworld representing prior maintenance and cure payments. In written reasons for judgment, the court itemized the pre-credit award as follows:

*1100
(1) General Damages $400,000.00
(2) Past Lost Wages 50,334.45
(3) Future Lost Wages 124,911.86
(4) Loss of Future Earnings Capacity 200,000.00
 ___________
 Total Award $775,246.31

Transworld appealed and assigned six errors. Plaintiffs answered the appeal and, likewise, urged six errors. For the reasons which follow, we affirm the award of general damages, amend the awards of future lost wages and past lost wages, and reverse the award of loss of future earnings capacity and the credit for maintenance payments. In all other respects, the judgment is affirmed.

FACTS
At approximately 8:00 a.m. on July 17, 1988, Ronald J. Bordelon, the tool pusher (rig supervisor) of rig 64, instructed Jenkins to help him unload a cargo box which had arrived the prior evening. The cargo box, which measured four feet wide, four feet high, and eight feet long, was placed adjacent to the auxiliary generator building. The cargo box lid, when in an open position, was secured to the box by safety chains which prevented the lid from falling backwards past 60 degrees beyond vertical, i.e., perpendicular to the platform.
Upon opening the lid, Jenkins noticed that the box was too close to the auxiliary generator building, causing the lid to fall backwards only 15 degrees beyond vertical. Slack still remained in the safety chains and the lid was leaning against a wall vent on the side of the auxiliary generator building. Jenkins surmised that the situation was unsafe because of the possibility that the lid might fall on them while unloading cargo. Jenkins warned Bordelon of the potentially hazardous condition and of his concern that the lid might fall on them. Bordelon responded that the lid would not fall on them and told Jenkins to help him remove the box's contents. Jenkins complied, and the two men leaned over the edge of the box. At that moment, the lid fell on Jenkins' neck and Bordelon's head and left arm. Jenkins, being smaller in stature than Bordelon, escaped first and, while in pain, called for help. The day crane operator, Cecil Gilmore, came to Jenkins' aid and, together, they lifted the lid from Bordelon's head.
Jenkins and Bordelon were transported by boat to the Port Lavaca, Texas Memorial Medical Center where Jenkins complained of pain in his neck, head, and shoulder. X-ray results were negative. Both men were sent back to the rig to complete the remainder of their "seven days on, seven days off" shift. After returning home to Natchitoches at the end of his shift, Jenkins saw his family physician, Dr. Otis Barnum, who diagnosed his condition as a whiplash injury. Dr. Barnum prescribed pain medication and muscle relaxants and instructed Jenkins to rest for the entirety of the week. Jenkins felt comfortable with Dr. Barnum's assessment that his condition would slowly improve. He returned later to work in pain and continued to do so in constant pain. He saw a Natchitoches orthopedic surgeon, Dr. John Sandifer, and underwent several sessions of physical therapy at Dr. Sandifer's direction. This conservative treatment proved ineffective and, on February 5, 1990, he was diagnosed with a herniated disc at the C-6,7 level by Dr. Carl Goodman, a Shreveport orthopedic surgeon. A week later, Dr. Goodman performed an anterior cervical disc excision and fusion in which a portion of his left pelvic bone was fused into the space formerly occupied by the C-6,7 disc.
In the intervening 18 months between Jenkins' neck injury and his surgery, he suffered an ankle injury on September 26, 1988 while working on rig 64. As a result, Jenkins was permanently disabled from continuing to work offshore. Jenkins and his wife settled with Transworld, Kerr-McGee, and Chevron for this ankle injury, receiving $60,000 plus one year of ankle injury related medical expenses from the date of settlement, August 12, 1989. The settlement for plaintiff's ankle injury was effected prior to the herniated disc diagnosis and surgery. The trial judge concluded that the ankle injury and related settlement were irrelevant to the disposition of the issues presented in this case. He therefore precluded defendants from seeking a credit *1101 against their liability for Jenkins' neck injury by presenting evidence concerning the ankle injury. Such evidence was proffered into the record by defendants.
Jenkins' recovery from neck surgery was relatively normal except for the development of posterior lateral stenosis, a bony narrowing of the spinal canal at the nerve point with associated bone spurs. This condition was confirmed by an MRI conducted approximately eight and one-half months after surgery. Dr. Goodman assigned Jenkins a 20% permanent partial disability of his neck as related to the body as a whole. He further limited his lifting, bending, and twisting activities for the remainder of his life. On November 3, 1990, Jenkins began full time employment as a rural mail carrier, a job he was performing at the time of trial.

ISSUES
The issues presented in this appeal are set forth in the respective parties' assignments of error. Defendant, Transworld, urges that the trial court erred in the following respects:
1. Ruling that evidence of the subsequent ankle injury and settlement was irrelevant;
2. Awarding $400,000 in general damages;
3. Computing past lost wages based on pre-tax earnings;
4. Computing future lost wages by use of an improper method;
5. Including employer contributions to FICA as an element of past and future lost wages;
6. Awarding both future lost wages and future lost earnings capacity.
Plaintiffs answered defendants' appeal and assigned the following errors:
1. Failing to find rig 64 unseaworthy;
2. Failing to award Faye Jenkins loss of consortium damages;
3. Insufficiency of the future lost wages award;
4. Allowing defendants a credit for maintenance payments without sufficient proof at trial;
5. Failing to award punitive damages;
6. Failing to cast Kerr-McGee in judgment.
Plaintiffs failed to brief their last assignment of error. In accordance with Rule 2-12.4 of the Uniform RulesCourts of Appeal, we consider this assignment of error as having been abandoned by plaintiffs. We shall address the remaining 11 assignments.

OPINION
Relevance of the subsequent ankle injury and settlement
Prior to trial and in response to plaintiffs' motion in limine, the trial court ruled that any evidence of the subsequent ankle injury and settlement was irrelevant and would not be allowed into the record at trial. Defendants sought to introduce the settlement to obtain a credit in the amount paid in settlement against whatever amount the plaintiffs would eventually be awarded in judgment on the neck injury. On appeal, Transworld argues that the ankle injury was relevant and the settlement thereon admissible because, despite the fact that Jenkins was injured twice, he was only disabled once from offshore work. As such, Transworld urges that he is entitled to receive only one recovery for his single disability resulting from both injuries.
Transworld concedes in brief that there is no factually similar maritime case in which such a credit was granted. However, Transworld analogizes the present situation to that in Hernandez v. M/V Rajaan, 841 F.2d 582 (5th Cir.1988), rehearing denied en banc, 848 F.2d 498 (5th Cir.1988), certiorari denied, 488 U.S. 981, 109 S.Ct. 530, 102 L.Ed.2d 562 (1988), and its progeny.[1] Trans world's reliance on these cases is misplaced. The plaintiff in Hernandez suffered one injury through the mutual *1102 fault of two tortfeasors. Prior to trial, plaintiff settled with one defendant for $410,000. Trial was then conducted against the remaining defendant. The U.S. Fifth Circuit held that the plaintiff was entitled to one recovery for the one injury. Since the court's award against the defendant represented 100% of the plaintiff's loss, the defendant was entitled to have the judgment reduced by the amount the plaintiff received in settlement. This ruling has come to be known as the "one recovery rule", which prevents the plaintiff from recovering more than 100% of his actual loss.
In this case, plaintiff suffered two separate and distinct injuries at different times while working on rig 64. The two injuries were manifested in different body parts, e.g., his neck and his ankle, and were wholly unrelated. Under these circumstances, the Jenkinses are entitled to "one recovery" for each separate injury, not "one recovery" for both injuries. They received the recovery for the ankle injury by settlement. Liability for and damages resulting from the neck injury were the only issues to be determined in this case. The proposition that a party cast in judgment for one injury would be entitled to receive a credit for monies it paid in settlement for a completely separate injury is logically unsound. Evidence of the ankle injury and settlement had no bearing on the determination of the limited issues presented by the neck injury trial. The evidence, proffered by defendants, was irrelevant, having no "... tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence". La.Code of Evidence art. 401. Accordingly, the trial court did not err in granting plaintiffs' motion in limine excluding evidence as to the ankle injury and settlement therefor.

General Damages
Transworld contends that the trial court abused its discretion by awarding plaintiff $400,000 in general damages. It suggests that a more appropriate award would have been in the range of $75,000 to $100,000.
It is well settled that the trier of fact has much discretion in awarding damages. Boswell v. Roy O. Martin Lumber Co., Inc., 363 So.2d 506 (La.1978). As a reviewing court, we cannot disturb the trier's award absent an abuse of discretion. Andres v. Liberty Mutual Insurance Co., 568 So.2d 651 (La.App. 3rd Cir.1990). In determining whether the trier of fact has abused its much discretion in its award, the appellate court must first examine the individual circumstances of the particular case and not prior awards. Reck v. Stevens, 373 So.2d 498 (La.1979); Andres, supra.
Plaintiff, Albert Jenkins, testified that he was knocked unconscious when the lid fell on his neck and was in immediate pain at the moment he regained his senses. The pain continued through his medical examination in Texas and completion of his shift on the rig. He continued to work on the rig in reliance on his doctors' opinion that his condition would improve. During the 18 month period between his injury and surgery, he experienced constant headaches which originated at the base of his neck and travelled to other parts of his head. He could only sleep in his recliner for, at most, 10 to 20 minutes at a time. In one instance, while taking care of his wife, a recovering cancer patient, he was in such extreme pain that he passed out. Jenkins thought he was having a heart attack because the pain was radiating into his left arm. He described the therapy prescribed by Dr. Sandifer as "excruciating" and "miserable". The pain also greatly curtailed his daily physical activities around the house and affected his mental state and disposition to the extent that his family would avoid his presence. Jenkins stated that, when the family went on vacation to San Antonio, he remained home to avoid making their vacation miserable.
After surgery, both his neck and hip were in severe pain, with the hip sometimes hurting more. He began to feel relief as the scars began to heal and finally began to sleep well a month after the surgery. He testified that, as of the trial date, there *1103 are still some household chores which he can no longer perform. He had to give up hunting and fishing, activities which he frequently took part in previously. Also, the residual pain caused by the stenosis (bone spurs) in his neck was still present at the time of trial. Jenkins expressed some doubt in his ability to continue on his rural mail route because of the effect on his spine of riding on bumpy rural roads.
Faye Jenkins generally corroborated her husband's testimony. She stated that he was most afraid of not being able to support his family and was constantly worried about what effect the injury would have on his employability. She further testified that, as his neck injury progressively worsened, he became very frustrated and easily irritable because of his inability to hunt, fish, and do household chores. Their sex life was also severely hampered due to his pain. She had the impression that he felt bad about being a burden on the family instead of its primary provider.
Dr. Carl Goodman, plaintiff's orthopedic surgeon, stated that a relatively lengthy delay between injury and diagnosis such as occurred in this case is not unusual. Additionally, he said that the pain in the hip area (the donor site) is almost always greater than the neck pain after this operation. Dr. Goodman characterized Jenkins' recovery from surgery as relatively easy and further stated that most disc surgery patients experience some bone spurring. He further testified that Jenkins' residual pain caused by the stenosis condition could possibly get worse with time, but he refused to say that it definitely would do so. While it was his opinion that riding daily in the car delivering mail could aggravate Jenkins' pain, he saw no reason why Jenkins should not be able to continue to work as a rural mail carrier.
After a thorough review of the record in light of the well established standard of review, we find that the trial court's award of $400,000 in general damages was, although in the high range of acceptable awards, not an abuse of discretion.

Past Lost Wages/Inclusion of employer FICA contributions
Transworld next complains that the trial court erred by awarding past lost wages based on pre-tax earnings. The trial court, awarded Jenkins $50,334.45 in past lost wages. Based on the testimony of Earl Thames, plaintiffs' economic expert, the court found plaintiff's gross past lost wages (pre-tax) to be $51,545.78 and, from this amount, subtracted $5,154.58 based on a 10% effective tax rate. Thus, after tax, past lost wages were $46,391.20. To this amount, the court then added $3,943.25 which represented employer contributions to FICA on behalf of Jenkins. The court reasoned that, since this amount would eventually be received by Jenkins as social security benefits, it was includible as an element of past lost wages. We disagree.
The trial court correctly deducted income taxes from the gross past lost wages amount. It is well settled that an award for lost wages under general maritime law should be based on after tax earnings. Myers, supra; Hernandez, supra. The trial court erred, however, in adding employer FICA contributions to the net past lost wages amount. The worker is entitled to be made whole for what he has lost, i.e., his net incomewhat he would have received had he continued to work. Madore v. Ingram Tank Ships, Inc., 732 F.2d 475 (5th Cir.1984). In other words, the lost income stream must be computed after deducting income taxes and social security taxes the worker would have paid had he continued to work. It is erroneous to thereafter add back the employer FICA contributions, which essentially represent the employer's half of contributions to the social security fund in the name of the worker. These payments, based upon a percentage of the gross amount paid to the worker, go directly from the employer to the federal government. The worker has no right to receive the resulting benefits until retirement or disability. Jenkins would not have directly received these payments as part of his income had he continued to work. Therefore, the employer contributions were not "lost" to him. Accordingly, *1104 we will amend the award for past lost wages by deducting $3,943.25 from the amount awarded ($50,334.45) to reach a correct total of $46,391.20.

Future Lost Wages/Inclusion of employer FICA contributions
The trial court awarded Jenkins $124,911.86 as future lost wages. This award was also based upon the testimony of Thames who had performed a study and testified regarding Jenkins' economic loss and diminished earnings capacity. Defendant argues that the trial court erred in this calculation because it added Jenkins' income taxes instead of subtracting them from the gross amount. The court also erred, according to Transworld, by including employer FICA contributions in the calculation of total future lost wages. Transworld in brief contends that the amount awarded was excessive, but, oddly enough, argues that the future lost wages figure should be $143,070.21 or $18,158.35 greater than what was actually awarded. In response, Jenkins contends that the amount should be $120,371.70 ($4,540.14 less than what was actually awarded).
It is well settled that future lost wage calculations in maritime cases are to be performed in compliance with the method set forth in Culver v. Slater Boat Co., 722 F.2d 114 (5th Cir.1983) (en banc), cert. denied sub. nom., Heinrich Schmidt Reederei v. Byrd, 467 U.S. 1252, 104 S.Ct. 3537, 82 L.Ed.2d 842 (1984), commonly known as Culver II. This case established a four step process for determining lost wages as follows:
(1) Estimate the loss of work life resulting from injury;
(2) Calculate the lost income stream;
(3) Compute the total amount of damages;
(4) Discount the total amount to its present value.
The lost income stream is calculated by adding gross income at the time of injury to other income (fringe benefits) then subtracting required payments by the wage earner (such as taxes and work expenses). "The paramount concern of a court awarding damages for lost future earnings is to provide the victim with a sum of money that will, in fact, replace the money that he would have earned ... If forecasts of future inflation are not used, it is necessary for the factfinder to choose an appropriate below market discount rate, which process is concededly difficult". Culver, supra, at 122.
A thorough review of Dr. Thames' testimony and his calculations reveals that he substantially complied with the process established in Culver II. The only exception being that he included $14,493.80 of employer FICA contributions in the computation of fringe benefits. This was, for reasons stated in the above section of this opinion, clearly erroneous. Upon deducting this amount from the calculation and dividing the result by the work life expectancy (232/12 years), we arrive at an annual average future lost wages of $6,175.69. The present value discounted at 1½% is $120,373.46, the correct amount the trial court should have awarded for future lost wages. Accordingly, we will amend the judgment to reflect an award of future lost wages in the amount of $120,373.46.

Future Lost Earnings Capacity
The trial court awarded Jenkins $200,000 for future lost earnings capacity. Defendant asserts that this award was duplicative of the award for future lost wages and should be reversed. Transworld further contends that no state or federal jurisprudential authority exists for awarding both elements of damage in the same suit. It states that, historically, damages for future lost earnings capacity have been awarded only when the plaintiff had no prior work history and possessed only a capacity to earn money. In the alternative, Transworld argues that even if both elements of damages are collectible in the same suit, the plaintiff failed to present sufficient evidence to justify an award for future lost earnings capacity. In awarding this amount, the trial court reasoned that it represented what Jenkins would have earned had he been able to continue working for Transworld and earn promotions to higher salaried positions. In other words, *1105 the award was the difference between his earnings potential and his actual earnings prior to injury.
A claim for loss of earnings need not be proven with mathematical certainty, but only by such proof as reasonably establishes plaintiff's claim. Veazey v. State Farm Mutual Automobile Insurance Co., 587 So.2d 5 (La.App. 3rd Cir.1991). In Guidry v. Sam Grimmett, Inc., 557 So.2d 249, 253 (La.App. 3rd Cir.1989), writ denied, 558 So.2d 557 (La.1990), this court reasoned as follows:
Damages for loss of future earnings are speculative. Factors which should be considered in assessing such an award include age, life expectancy, work life expectancy, investment income factor, productivity increase, prospects for rehabilitation, probable future earning capacity, loss of future earning capacity, loss of earning ability, and inflation. Lanclos v. Rockwell International Corporation, 470 So.2d 924 (La.App. 3rd Cir. 1985); writ denied, 477 So.2d 87 (La. 1985). (Emphasis ours)
Furthermore, in Folse v. Fakouri, 371 So.2d 1120, 1124 (La.1979), the Supreme Court stated as follows:
Earning capacity in itself is not necessarily determined by actual loss; damages may be assessed for the deprivation of what the injured plaintiff could have earned despite the fact that he may never have seen fit to take advantage of that capacity. The theory is that the injury done him has deprived him of a capacity he would have been entitled to enjoy even though he never profited from it monetarily.
In awarding damages for impairment of earnings capacity, the trial court is accorded broad discretion. Perez v. State Through Department of Transportation and Development, 578 So.2d 1199 (La.App. 4th Cir.1991), writ denied, 581 So.2d 706 (La.1991).
Clearly, future lost earnings capacity can be considered a separate element of damages within the broader category of future lost earnings. See Veazey, supra. In assessing Jenkins' future lost income, Dr. Thames did not take into consideration what he potentially could have earned in the future with Transworld had he not been injured, e.g., his future lost earnings capacity. Jenkins argues that he sufficiently proved this element of damages through the testimony of Mallory Lessard, a Senior STS and Claims Supervisor employed by Transworld. Lessard testified that, at the time of trial, he was earning $36,000 per year. Jenkins contends that, because of his excellent work record, he would have eventually been promoted to the same position as Lessard if he would not have been injured and required to cease working for Transworld. There is no evidence in the record to support this conclusion and certainly no evidence of any timetable within which this potential promotion was scheduled to take effect. Additionally, it was established as fact that Jenkins continued to work aboard rig 64 after his neck injury occurred and through the time in which he suffered the ankle injury. It was the ankle injury, not the neck injury, which disabled him from offshore work. This determination of disability was made prior to the neck injury diagnosis and surgery. Quite simply, plaintiff was not deprived by the neck injury of what he could have earned or of a capacity he would have been entitled to enjoy. Jenkins should not be allowed to recover for future lost earnings capacity when, if anything, his ankle injury and not his neck injury caused this element of damages. Awarding damages for future lost earnings capacity was clearly an abuse of the trial court's discretion and duplicative. Accordingly, we reverse the $200,000 award for future lost earnings capacity in its entirety.

Determination of Seaworthiness/Loss of Consortium Claim
The trial court concluded that no unseaworthiness was involved in causing the injury to Jenkins. The sole cause of his injury was determined to be the negligence of Transworld's employees in placing the cargo box too close to the auxiliary generator building. In finding no unseaworthiness, the court reasoned that "[T]his type *1106 of cargo box is commonly used on offshore drilling rigs and there is nothing inherently unsafe about this particular box". Plaintiffs contend that the determination of seaworthiness was erroneous in light of federal jurisprudence to the effect that an improper method of handling cargo by the crew can amount to unseaworthiness. See Blassingill v. Waterman Steamship Corporation, 336 F.2d 367 (9th Cir.1964).
Under the admiralty doctrine of warranty of seaworthiness, the vessel owner has a duty to provide a vessel that is reasonably fit for its intended use, and this duty to provide a seaworthy vessel requires that its gear, appurtenances and operation must be reasonably safe. Reed v. Seacoast Products, Inc., 458 So.2d 971 (La.App. 3rd Cir.1984), citing Drachenberg v. Canal Barge Co., Inc., 571 F.2d 912 (5th Cir. 1978), appeal after remand, 621 F.2d 760 (5th Cir.1980). This duty is a nondelegable liability without fault and is independent of the Jones Act duty to exercise reasonable care. A factual finding of seaworthiness or unseaworthiness by the trier of fact is reviewed under the clearly erroneous standard. Griffin v. LeCompte, 471 So.2d 1382 (La.1985).
We pretermit any discussion on the issue of seaworthiness for the following reasons. Plaintiffs admit in brief that the reason they desire the reversal of the seaworthiness ruling is that the viability of Faye Jenkins' loss of consortium claim is inextricably connected to a determination of unseaworthiness. Stated another way, the loss of consortium claim is dependent upon a determination of unseaworthiness. Transworld, in reply brief, argues that the plaintiffs' position is not a true representation of the present state of the applicable law. Defendant's position is correct.
Damages recoverable in general maritime causes of action for personal injury do not include loss of consortium. Michel v. Total Transportation, Inc., 957 F.2d 186 (5th Cir.1992). In Michel, supra, the U.S. Fifth Circuit relied primarily upon the United States Supreme Court's decision in Miles v. Apex Marine Corporation, 498 U.S. 19, 111 S.Ct. 317, 112 L.Ed.2d 275 (1990), which held that no recovery for loss of society was available for the wrongful death of a seaman, whether under the Death on the High Seas Act, the Jones Act, or general maritime law. The Michel court extended this uniform rule to also encompass personal injury cases. Applying these principles to the present action, it is clear that Faye Jenkins is not entitled to recover for her loss of consortium. This being so, it is not important whether rig 64 was seaworthy because, as plaintiffs concede, their reason for challenging this determination and having it reversed is to allow recovery for her loss of consortium. Thus, we pretermit any discussion on the merits of the trial court's factual determination that the vessel was seaworthy because, whether seaworthy or not, Faye Jenkins cannot recover for her loss of consortium.

Sufficiency of Future Lost Wages and Future Lost Earnings Capacity
Plaintiff contends that the amounts awarded should be increased to between $400,000 and $450,000. For reasons discussed above, we find that the award for future lost wages as amended, i.e., $120,373.46 is sufficient to fully compensate plaintiff for future lost wages. Also, Jenkins is not entitled to an award for loss of future earnings capacity.

Credit for Maintenance and Cure Payments
The trial court granted a $8,177.18 credit in favor of Transworld for maintenance and cure payments made to and on behalf of Jenkins. Plaintiffs argue that the trial court erred when it allowed defendant a credit for the maintenance payments. Further, plaintiffs assert that the maintenance portion of this amount was unproven and undocumented in the record. Defendant retorts that it supplied the figure to plaintiffs' counsel who, in turn, prepared the judgment incorporating the amount of the credit and submitted same to the trial judge for his signature. It contends plaintiffs agreed thereto.
In his reasons for judgment, the trial judge ruled that Transworld was entitled to a credit for maintenance payments plus $3,537.18 of hospitalization benefits provided *1107 by Transworld. The court ordered the parties to agree on the amount of maintenance payments or, in the alternative, a hearing would be conducted to determine this amount. Both plaintiffs and defendant agree in their respective briefs that the total amount of the credit was provided by defense counsel to plaintiffs' counsel, who, in turn, prepared the judgment incorporating the amount and submitted it to the trial court.
Maintenance is the equivalent of food and lodging which a seaman is entitled to while at sea. It is neither a substitute for wages nor is it to be considered in lieu of a seaman's wages, in whole or in part. Morel v. Sabine Towing and Transportation Co., 669 F.2d 345 (5th Cir. 1982). Maintenance payments may only be credited against amounts awarded which are the substantial equivalent of maintenance. Colburn v. Bunge Towing, Inc., 883 F.2d 372 (5th Cir.1989). Maintenance paid may not be deducted from an award for past lost wages. Phillips v. Western Co. of North America, 953 F.2d 923 (5th Cir.1992). The trial court did not award plaintiff an amount for maintenance or a substantial equivalent of maintenance. Under these circumstances and in light of the clear dictates of the federal jurisprudence cited above, the court erroneously granted Transworld a credit for maintenance payments made to Jenkins. Accordingly, we reverse the credit to the extent that it represented maintenance payments of $4,640.

Punitive Damages
The trial court did not award plaintiffs punitive damages. On appeal, Jenkins claims he is entitled to $100,000 in punitive damages for the conduct of the tool pusher, Bordelon. For the following reasons, we disagree and refuse to award punitive damages.
Punitive damages, which are meant to punish and deter, are recoverable under the general maritime law on a showing of willful and wanton misconduct by the shipowner. Reed, supra, at 979. Punitive damages in an action brought under the Jones Act must be grounded on egregious shipowner conduct (negligence) exhibiting wanton and intentional disregard of the seaman's rights. Harper v. Zapata Off-Shore Co., 741 F.2d 87 (5th Cir.1984). In determining whether punitive damages are warranted, each case is to be evaluated on its own facts. Breese v. A.W.I., Inc., 823 F.2d 100 (5th Cir.1987). Given the factual scenario discussed at the outset of this opinion, we conclude that punitive damages are not warranted in this case. Bordelon's conduct, while clearly negligent and unreasonable under the circumstances, nevertheless did not rise to the level of wanton, willful, egregious or intentional misconduct.

DECREE
For the above and foregoing reasons, the judgment of the trial court in favor of plaintiff, Albert Jenkins, and against defendant, Transworld, is amended to award for past lost wages the amount of $46,391.20 and future lost wages the amount of $120,373.46. Furthermore, the $200,000 award to Jenkins for future lost earnings capacity is reversed and the $4,640 credit granted to Transworld for maintenance payments is also reversed. In all other respects, the judgment is affirmed. All costs of this appeal are to be paid one-half (½) by plaintiffs-appellees and one-half (½) by defendant-appellant, Transworld Drilling Company.
AFFIRMED AS AMENDED.
NOTES
[1] Plaintiff also cites the factually similar cases of Myers v. Griffin-Alexander Drilling Co., 910 F.2d 1252 (5th Cir.1990); Teal v. Eagle Fleet, 933 F.2d 341 (5th Cir.1991); Rollins v. Cenac Towing Co., 938 F.2d 599 (5th Cir.1991); Constructores Tecnicos v. Sea-Land Service, 945 F.2d 841 (5th Cir.1991); and, Hardy v. Gulf Oil Co., 949 F.2d 826 (5th Cir.1992).