682 So.2d 894 (1996)
Anna BROUSSARD, et al, PlaintiffsAppellees,
v.
WAL-MART STORES, INC., et al, DefendantsAppellants.
No. 96-513.
Court of Appeal of Louisiana, Third Circuit.
November 6, 1996.
*896 Louis Goodwin Garrot III, Abbeville, for Anna Broussard et al.
John Goulding Swift, Lafayette, for Wal-Mart Stores, Inc. et al.
Before YELVERTON, KNOLL, and SULLIVAN, JJ.
SULLIVAN, Judge.
On Sunday, May 3, 1992, Anna Broussard slipped and fell in liquid bleach on the floor of the Wal-Mart store located in Abbeville, Louisiana. The accident occurred as Anna was looking at merchandise in a "four by four" or "four-way" bin located between checkout register number thirteen and the main pedestrian aisle of the store known as "action alley."
Anna and her husband, Marion Broussard, plaintiffs herein, sued Wal-Mart Stores, Inc. and the Abbeville store's managerial staff, *897 namely manager, Gary Banks, and assistant managers, Roger Washington, Pam Vallot, Octavia Green, and Patricia Montgomery. The Broussards alleged that Anna's fall was caused by defendants' negligence and resulted in injuries to her right knee and lower back. They also alleged that the fall aggravated Anna's previously nonsymptomatic spinal stenosis and caused it to become symptomatic after the fall. Additionally, the Broussards asserted that Anna's physical injuries caused significant mental depression. Marion also asserted a loss of consortium claim. Defendants answered, alleging primarily that they were not at fault and, alternatively, Anna's comparative fault.
After a bench trial held October 17 to October 19, 1995, the trial court rendered oral reasons for judgment, concluding that the Broussards met their burden of proving, pursuant to La.R.S. 9:2800.6, that Anna was injured by an unsafe condition for which Wal-Mart had constructive notice. Furthermore, the trial court found Anna free from comparative fault. The trial court then took under advisement the extent of Anna's injuries and the amount of damages.
On November 21,1995, the trial court rendered written reasons for judgment, finding that the fall caused an aggravation of Anna's preexisting stenosis and that the aggravation resulted in Anna's continuing symptomatic pain. The trial court also causally related Anna's mental depression to her fall. Pursuant to these reasons, the trial court awarded $243,692.48 in total damages to the Broussards. The award was made up of the following elements of damage:

Past medical expenses $ 33,718.81
Future medical expenses (surgery) 50,000.00
Past loss of earnings and earning
capacity 25,726.40
Future loss of earning capacity 17,182.77
Loss of household services 7,064.50
General damages 100,000.00
Loss of consortium (to Marion) 10,000.00
 ___________
Total Damages Awarded $243,692.48

On December 19, 1995, the trial court signed a judgment in favor of the Broussards and against Wal-Mart in accordance with these reasons. The trial court assessed all costs of court to Wal-Mart.
From this judgment, Wal-Mart perfected a suspensive appeal. On appeal, Wal-Mart maintains the trial court erred in:
I. Failing to grant Wal-Mart's motion in limine regarding elements of special damage which were not specifically pled, or, alternatively, failing to grant Wal-Mart's request for a jury trial on all issues.
II. Finding Wal-Mart to be at fault for causing Anna's injuries.
III. Finding Anna to be free of comparative fault.
IV. Awarding an excessive amount of damages.
For the reasons which follow, we find partial merit in Wal-Mart's first assignment of error. Specifically, we conclude that the trial court erred in allowing into evidence proof of Anna's past loss of earning capacity, an element of special damages for which plaintiffs did not specifically plead. We, therefore, amend the judgment to delete this element of damages from the award. In all other respects, we affirm the trial court's judgment.

JURY TRIAL/MOTION IN LIMINE
Wal-Mart's first assignment of error involves pretrial procedure. Wal-Mart asserts that the trial court erred in denying its two motions for jury trial and in denying its motion in limine concerning evidence of two elements of damage, past loss of earning capacity and the cost of vehicle hand controls.
Plaintiffs did not specify the amount of damages sought or request a jury trial in their petition. Likewise, defendants did not request a jury trial in their answer. On July 6, 1993, in response to defense interrogatories, plaintiffs for the first time stated that the amount of damages claimed were in excess of $20,000.00, which at the time was the jurisdictional amount necessary to obtain a jury trial.
On May 15, 1995, plaintiffs filed a "Motion and Order to Assign Case for Trial." Although the Broussards did not pray for a jury trial, the substance of the order signed by the court provided that "this cause be assigned for jury trial." Three days later, on *898 May 18, 1995, plaintiffs filed an "Amended Motion and Order to Assign Case for Trial" in which they acknowledged that the prior order erroneously contained the jury trial language. Because no party had to that point demanded a jury trial, plaintiffs requested that the case be reset as a bench trial. The trial court signed the order assigning the case for a bench trial.
On May 26, 1995, eight days after plaintiffs' amended motion was filed and the corresponding order was signed by the trial court, defendants filed a motion for jury trial. On June 22, 1995, the trial court denied this motion.
On August 28, 1995, in supplemental response to defendants' interrogatories, the Broussards asserted that their damages included Anna's past loss of earning capacity and the cost of vehicle hand controls. In response, three days later, defendants filed a "Motion in Limine and/or Motion for Trial by Jury." Therein, defendants maintained that, because these items of special damages were not specifically alleged in a pleading as required by La.Code Civ.P. art. 861, the plaintiffs were prohibited from presenting evidence on and recovering for these elements of damage. Alternatively, defendants argued that if the trial court were to allow evidence of these two elements of damage, then plaintiffs' interrogatory responses amounted to an amendment of their petition, which would entitle defendants to a jury trial under La. Code Civ.P. art. 1733(C), because defendants' motion was filed within ten days of service of the last pleading directed to any issue triable by a jury. On the first day of trial, the trial court signed a judgment denying defendants' motion in limine and second motion for a jury trial.
Wal-Mart first contends that its May 26, 1995 motion for jury trial was improperly denied because the motion was filed within ten days of the trial court's granting of a motion to withdraw a jury trial demand. La. Code Civ.P. art. 1733(C) provides:
The pleading demanding a trial by jury shall be filed not later than ten days after either the service of the last pleading directed to any issue triable by a jury, or the granting of a motion to withdraw a demand for a trial by jury.
The trial court's order signed May 18, 1995 did not constitute the "granting of a motion to withdraw a demand for a trial by jury." It merely corrected the error of the May 15, 1995 order, which had granted a jury trial on plaintiffs' motion to assign the case for trial. As plaintiffs correctly point out, at the time they filed their May 15, 1995 motion, they did not pray for or demand a jury trial and, by law, had no such right to demand a jury trial because the motion was filed well over ten days after service of the last pleading directed to any issue triable by a jury. Therefore, because plaintiffs' May 15, 1995 motion was inadvertently granted as a trial by jury and the May 18, 1995 order corrected the error and granted plaintiffs a bench trial, no right to demand a jury trial inured to defendants' benefit when the trial court signed the May 18, 1995 corrective order. In other words, the signing of the order did not commence a ten-day "window of opportunity" within which defendants could ask for a jury trial. The trial court properly denied defendants' first motion for jury trial.
Wal-Mart next maintains that its August 31, 1995 motion for jury trial was timely filed and should have been granted because it was done within ten days of service of plaintiffs' supplemental responses to interrogatories, which asserted claims for past loss of earning capacity and the cost of vehicle hand controls. Wal-Mart argues that plaintiffs' responses constitute a pleading directed to issues triable by a jury.
Pleadings are defined as "petitions, exceptions, written motions, and answers." La.Code Civ.P. art. 852. A response to discovery is not a pleading directed to a triable issue. Guzman v. Crispy Catfish and Seafood, Inc., 95-3031 (La.2/16/96); 667 So.2d 1037, citing Zeller v. Jording, 624 So.2d 432 (La.App. 4 Cir.1993). Therefore, plaintiffs' response clearly did not constitute a pleading, which is required by La.Code Civ.P. art. 1733(C) to commence the running of the ten-day rule. The trial court properly denied defendants' second motion for jury trial.
*899 Wal-Mart's final argument in this assignment of error concerns the trial court's denial of its motion in limine. It asserts that, if plaintiffs' supplemental response to defendants' interrogatories is not a pleading, then the trial court incorrectly allowed plaintiffs to present evidence on past loss of earning capacity and the cost of vehicle hand controls, two elements of special damage which were first asserted in plaintiffs' supplemental response but not specifically pled in a pleading.
"When items of special damage are claimed, they shall be specifically alleged." La.Code Civ.P. art. 861. In Stevens v. Winn-Dixie of Louisiana, 95-435, p. 9 (La. App. 1 Cir. 11/9/95); 664 So.2d 1207, 1213, the first circuit stated:
"Special damages" are those which can be fixed to a pecuniary certitude. Generally, a trial court may not award special damages which have not been specifically plead. The purpose of the specificity requirement is to avoid the imposition of surprise upon the defendant. The only exception to this general rule is where otherwise inadmissible evidence of special damages is admitted without objection and the pleadings are thereby enlarged to encompass those special damages.
(Citations omitted.)
In paragraph twelve of their petition, plaintiffs alleged that the accident caused, among other elements of damage, the following three classifications of damage:
A. Medical expenses to date actually incurred and future medical expenses;
B. Loss of wages and wage benefits to date;
C. Loss of future earnings capacity and earnings benefits in a reasonable sum;
The issues presented are whether past loss of earning capacity is reasonably includible within "[l]oss of wages and wage benefits to date" and whether the cost of vehicle hand controls is reasonably includible within "future medical expenses." In other words, were plaintiffs' specific allegations in their petition of special damage classifications sufficiently broad enough to encompass the two contested elements of special damage asserted in plaintiffs' supplemental response to interrogatories?
We conclude that past loss of earning capacity is an element of special damages that must be specifically alleged in a petition. Plaintiffs' use of the terminology "loss of wages and wage benefits to date" denotes an actual loss of what Anna would have earned had she not been injured. Loss of earning capacity, on the other hand, "is not necessarily determined by actual loss; damages may be assessed for what the injured plaintiff could have earned despite the fact that he may never have seen fit to take advantage of that capacity." Jenkins v. Kerr-McGee Corp., 613 So.2d 1097, 1105 (La.App. 3 Cir.), writs denied, 616 So.2d 701, 702 (La.1993), citing Folse v. Fakouri, 371 So.2d 1120 (La. 1979). The specific allegation of "loss of wages and wage benefits to date" does not encompass damages for past loss of earning capacity. As such, the trial court erred in denying defendants' motion in limine and allowing plaintiffs to present evidence of past loss of earning capacity.
As to the cost of vehicle hand controls, this element of special damage is within the scope of future medical expenses. The evidence presented indicates that Anna was evaluated at the Our Lady of Lourdes Regional Medical Center's Driving Program by occupational therapist Holly Domingue. The therapist concluded that Anna was incapable of driving an automobile without the assistance of hand controls and spinner knobs for steering. In his deposition, Dr. John Cobb, Anna's treating orthopedic surgeon, stated that he would prescribe vehicle hand controls if recommended by the Lourdes Driving Program. The hand controls are obviously considered functional aids much like wheelchairs, walkers, or braces. They are, when deemed medically necessary for driving, reasonably considered a future medical expense. In summation, the trial court did not err in denying defendant's motion in limine with regard to evidence concerning vehicle hand controls and their cost.

BURDEN OF PROOF
Wal-Mart maintains that the trial court erred in concluding that the Broussards met *900 their burden of proof as provided in La.R.S. 9:2800.6. Specifically, Wal-Mart contends that the trial court erred in finding it had constructive notice of the spill and that its procedures employed for detecting floor hazards were not reasonable under the circumstances.
Plaintiffs' burden of proof in this case is governed by La.R.S. 9:2800.6[1] which, at the time of Anna's accident, provided:
A. A merchant owes a duty to persons who use his premises to exercise reasonable care to keep his aisles, passageways, and floors in a reasonably safe condition. This duty includes a reasonable effort to keep the premises free of any hazardous conditions which reasonably might give rise to damage.
B. In a negligence claim brought against a merchant by a person lawfully on the merchant's premises for damages as a result of an injury, death, or loss sustained because of a fall due to a condition existing in or on a merchant's premises, the claimant shall have the burden of proving, and in addition to all other elements of his cause of action, that:
(1) The condition presented an unreasonable risk of harm to the claimant and that risk of harm was reasonably foreseeable;
(2) The merchant either created or had actual or constructive notice of the condition which caused the damage, prior to the occurrence; and
(3) The merchant failed to exercise reasonable care.
C. Definitions:
(1) "Constructive notice" means the condition existed for such a period of time that it would have been discovered if the merchant had exercised reasonable care.
(2) "Merchant" means one whose business is to sell goods, foods, wares, or merchandise at a fixed place of business.
D. Nothing herein shall affect any liability which a merchant may have under Civil Code Arts. 660, 667, 669, 2317, 2322 or 2695.
The applicable pre-May 1, 1996 version of the statute is "decidedly pro-defendant." Welch v. Winn-Dixie of Louisiana, Inc., 94-2331, p. 9 (La.5/22/95); 655 So.2d 309, 314. It places a "strict burden" on slip and fall plaintiffs to prove all of the elements listed therein. Stevens, 664 So.2d at 1210.
In Welch, 655 So.2d 309, plaintiff slipped and fell in cooking oil on the aisle floor of defendant's store. The supreme court considered plaintiff's burden with regard to defendant's constructive notice of the hazard, e.g., that it was difficult if not impossible for a plaintiff to prove that the condition existed for such a period of time that it would have been discovered had the merchant exercised reasonable care. The supreme court concluded that, when a plaintiff proves that the merchant does not have in place a uniform, mandatory, non-discretionary, clean-up and safety procedure, the fact-finder may reasonably infer that this failure revealed a lack of reasonable care on the merchant's part. "The length of time a foreign substance is on the floor diminishes in relevance if the defendant merchant has no mechanism in place to discover such a hazard." Id. at 318.
In the present case, Anna's fall occurred near checkout register thirteen and a "four by four" display bin. Wal-Mart's employees uniformly testified that the cashier at a particular register is responsible for "zoning" the particular register area and its displays. However, if a cashier is busy checking out customers for an extended period of time, the area is not "zoned" by anyone. The Wal-Mart employees also uniformly stated that "everyone" was responsible for "zoning," which included straightening up, picking up items that had fallen on the floor, and looking for spills. At the time of Anna's fall, one employee, Rodney Harris, was assigned to sweep the entire store including the checkout area. Since it was a Sunday, the store opened at eleven o'clock a.m. Anna fell just *901 after one o'clock p.m., and Harris did not sweep the checkout area until two o'clock p.m.
In oral reasons for judgment, the trial court stated, in pertinent part, as follows:
I have focused in on this second sentence of that first paragraph, Paragraph A of the statute, because it seems that the legislature wanted triers of fact in cases such as this one, and merchants, to know that part of the duty being placed upon them to exercise reasonable care includes an effort of some kind.
....
And I accept as fact that each Wal-Mart employee upon hiring was given a safety manual, was told to read it; signed an acknowledgement for it; was told that safety was something that Wal-Mart was concerned about; and attended some meetings; maybe did or did not see some videos and other materials regarding safety; were told about zone defense; and, were told in general terms to treat the place where they worked as they would their own home in terms of safety.... I believe that all of them received the safety manual and some safety training, none of them displayed or testified to a pervasive mood or safety on the part of Wal-Mart. It was almost a perfunctory thing in their minds.
....
These employees continually talked about the zoning defense as picking up merchandise, or straightening up, and then, sort of as an afterthought when asked by counsel, "Oh, yes, and of course, if I saw a spill, I'd take care of it." But when asked "What does zoning mean?," not one of them said "The first thing is to look for hazards", indicating to me that that was not the emphasis placed by Wal-Mart.
....
Plaintiff in brief asks the question how is the plaintiff supposed to prove how long it was there. And I agree with the plaintiff that it's impossible to do that. Plaintiff doesn't know.... I believe the merchant can establish that it was not there for such a period of time that it would have been discovered, if the merchant can show that there were reasonable efforts to discover it.... I think there has to be a conscious effort on the part of the merchant to look for these things. Because he should know that the plaintiff is going to be pre-occupied with the displays and things going on in the store that the merchant wants the plaintiff to pay attention to, not the floor.
....
I find in this case, that the store had constructive notice of the spill, by virtue of the fact that they did not have in place a system or some method which amounts to a reasonable effort as required by the statute.
....
The present case is very similar to Welch, 655 So.2d 309. Our complete review of the record reveals that the trial court did not manifestly err in concluding that plaintiffs proved Wal-Mart did not have in place a reasonable safety and inspection procedure. Given this lack of adequate procedures, it was reasonable for the trial court to conclude that Wal-Mart would not have discovered the liquid bleach within a reasonable time. As in Welch, the trial court in the present case did not err in recognizing that the plaintiffs' burden to prove constructive notice in this class of cases is diminished by the absence of reasonable safety and inspection procedures on the part of the defendant. The trial court's factual conclusion that plaintiffs met their burden of proof is not clearly wrong.

COMPARATIVE FAULT
Wal-Mart contends that the trial court erred in failing to allocate a percentage of fault to Anna for her failure to keep a proper lookout.
The determination and allocation of fault are factual inquiries which are subject to the manifest error/clearly wrong standard of review. Adkinson v. Brookshire Grocery Co., Inc., 95-1021 (La.App. 3 Cir. 1/31/96); 670 So.2d 453, writ denied, 96-0514 (La.4/8/96); 671 So.2d 339. Comparative fault is conduct below the standard of care which one should perform for one's own protection. The defendant bears the burden of proving plaintiff's comparative fault by a preponderance *902 of the evidence. Bergeron v. K-Mart Corp., 540 So.2d 406 (La.App. 1 Cir.), writs denied, 544 So.2d 408, 412 (La.1989). Although a customer has a duty to exercise reasonable care under the circumstances, the customer's duty to keep a proper lookout is lessened when merchandise on the merchant's shelves and displays attracts his or her attention. This diminishment of duty is based on the merchant's intentional efforts to draw the customer's attention to the merchandise, which necessarily reduces the amount of attention the customer pays to the path he or she takes. Stark v. National Tea Co., 94-2633 (La.App. 4 Cir. 5/16/95); 655 So.2d 769, writ denied, 95-1801 (La.11/3/95); 661 So.2d 1380. To show that the plaintiff was comparatively at fault, the merchant must prove that the plaintiff actually saw or reasonably should have seen the floor hazard prior to the accident. See Brown v. Great Atlantic & Pacific Tea Co., Inc., 509 So.2d 557 (La.App. 3 Cir.1987).
The record indicates that the liquid bleach spill was clear and was located on a light colored floor next to a "four by four" bin. Anna was looking at merchandise, which was for sale, located in the bin. Immediately before her fall, Anna's grandson called her name and she turned toward him. When she took her first step toward him, she slipped in the liquid bleach.
Under these circumstances, we conclude that the trial court's determination that Anna was free from fault in causing the accident is not manifestly erroneous. There is no evidence that she saw or reasonably should have seen the clear spill as she turned her attention from the merchandise display to her grandson and fell immediately upon taking one step in his direction.

CAUSATION AND DAMAGES
Wal-Mart maintains that the trial court erred in failing to find that Anna returned to her pre-accident condition approximately a year and a half following her fall. This alleged error is Wal-Mart's predicate for asserting that:
(1) Past medical expenses awarded, $33,718.81, should be reduced to $23,302.14, the amount expended during the year and one-half following the accident;
(2) Future medical expenses, $50,000.00, should not have been awarded because the corrective surgery proposed by Dr. Cobb is not necessary as a result of the accident;
(3) Past loss of earnings and earning capacity award of $25,726.40 was excessive;
(4) Loss of household services award of $7,064.50 was excessive;
(5) Future loss of earning capacity award of $17,182.77, for two years from trial, was unsupported by the evidence; and
(6) General damages of $100,000.00 and loss of consortium of $10,000.00 were an abuse of discretion.
In written reasons, the trial court comprehensively summarized the medical evidence as follows:
The plaintiff, Anna Broussard, was treated at Abbeville General Hospital on the day of the fall at Wal-Mart, May 3, 1992. The next day she went to see her family physician, Dr. Sidney Crackhower. He testified that he has been the plaintiff's family physician since 1987, and has never treated her for lumbar or hip complaints. She did have arthritic problems in the upper and lower extremities, but not in the spine. Dr. Crackhower had no reason to believe that the plaintiff was ever disabled from doing housework or babysitting until the time of the fall at Wal-Mart. On this visit he prescribed a muscle relaxant and medication to relieve her complaints of pain, then referred her to Dr. John Cobb, an orthopedic surgeon.
Dr. Cobb had treated Anna Broussard in 1985 for injuries from an automobile accident to her right hand and arm, her neck, and her lower back. He had then performed surgery on her right hand and arm, and referred her to a neurosurgeon, Dr. Robert Rivet, who performed disk surgery on her neck. The lower back pain resolved with three or four months of conservative treatment. Dr. Cobb had not seen her between her release from his care in October 1986 and her first appointment after the fall at Wal-Mart on May 18, 1992.

*903 She complained to him on that date of pain in her lower back which radiated down into the right hip, knee and foot. She was wearing a knee immobilizer and was using a wheelchair. She was unable to walk during the examination. Dr. Cobb's first impression was that the plaintiff was suffering from post-traumatic lumbar pain syndrome and a local injury to the right knee. He wasn't sure what was causing the pain in her back and legs, so he recommended an MRI of the lumbar spine and the right knee.
The results of these tests did not show any internal derangement in the knee, and he decided to manage the pain with Celestone injections. The lumbar tests did not show any disk herniation, but were positive for some adaptive changes in the form of hypertrophic spurring and degeneration of the facets. He chose to inject steroids into the back to cool the inflammation and relieve the pain. Further treatment was postponed because the plaintiff needed to undergo gall bladder surgery.
Anna Broussard was back on August 31, 1992 complaining of moderate pain in her lower back and down into the right leg and knee. Dr. Cobb recommended therapy. By October 5, her knee showed improvement, but additional epidural injections were ordered for the pain in her back and legs.
The knee pain resolved about five months after the fall. Dr. Cobb opined that the plaintiff had suffered a strain to the medial side of the knee and the hamstring ligaments causing inflammation and pain. She also had contusions to the kneecap joint which also contributed to the pain and swelling. In November 1992 the injection therapy was performed at the hospital and included both an injection into the knee joint and an epidural. This gave the plaintiff some relief, but did not eliminate the pain. Dr. Cobb suggested some exercises and physical therapy to recondition the back. Progress over the next few months was very slow, and several medications, devices and therapies were tried without much success.
In February 1993 Dr. Cobb became concerned that the plaintiff was dragging her right foot while walking. By March the doctor felt that she was not going to benefit from additional therapy. Not thinking that surgery was called for at that time, Dr. Cobb referred her to Dr. Olga Arter Reavill, a chronic pain specialist for a more comprehensive pain management plan. He did not see the plaintiff after this referral until July 10, 1995 when she returned with the same basic complaints as before.
The plaintiff's complaints were difficult to evaluate neurologically because she was born with Charcot-Marie-Tooth, a hereditary disease that cripples nerves in the body. This disease causes weakness in the nerve structure and can result in many of the same conditions and symptoms that are seen in connection with neurological damage caused by trauma. Dr. Cobb decided to focus on the back in an effort to diagnose the cause of the plaintiff's pain. He ordered a lumbar myelogram and a CAT scan.
The results of the diagnostic tests indicated a significant degree of stenosis in the lower back, which is a narrowing of the spinal canal where the nerves travel from enlargement of the bones next to the canal, causing the nerves to be pinched and displaced. This was the cause of pain in her back and legs. At this time, Dr. Cobb felt that the plaintiff would benefit from surgery to enlarge the canal and free the pinched nerves. This surgery is a major reconstructive back procedure costing approximately $55,000 to $60,000, including surgical fees and hospital costs.
Stenosis itself is a product of aging and often produces no symptoms. The condition can become symptomatic from a trauma. In retrospect, Dr. Cobb realized that Anna Broussard's complaints and symptoms were consistent with symptomatic stenosis. He believes to a medical probability that the fall in Wal-Mart caused these symptoms to manifest themselves. The condition has caused her foot to drop and has contributed significantly to her present difficulties in walking and has reduced her ability to perform her work as a housekeeper and babysitter.

*904 Dr. Cobb expects surgery will eliminate 80% of Anna Broussard's pain, which is the main goal. He also expects that the operation would improve her ability to walk and to perform other physical functions somewhat, but only as an indirect result of reducing her pain level. Her activities would still be limited. She will have to refrain from prolonged sitting and from bending, stooping, and squatting. She will be able to hold a job so long as it is sedentary in nature and includes the ability to change positions and move about to take the pressure off her back. She must restrict all of her activities to protect her back.
Without surgery, Dr. Cobb does not believe that the plaintiff will improve. There will be no spontaneous resolution of the stenosis. She could live with it, but she would have to tolerate a great deal of pain. She has a 20% impairment of the body as a whole as the result of the condition in her back. Dr. Cobb has no reason to believe that the plaintiff would have developed symptoms from the stenosis but for the fall at Wal-Mart. Only 15% to 20% of people with stenosis ever become symptomatic without trauma, and Anna Broussard had already reached the age where the symptoms should have manifested themselves if she were in that percentile.
At one point during his treatment of the plaintiff, Dr. Cobb noted that she had become depressed, so he referred her to Michael Berard, Ph.D., a clinical psychologist for evaluation and treatment. Dr. Berard attributes her depression to the fact that she is not ambulatory and to her inability to do her normal household and work duties. She was simply unable to function normally, and this led to a depressed state of mind. She began experiencing frequent crying spells and catastrophic thinking, feelings of hopelessness and concern that she would never walk again. She was fatigued from having to cope with the pain of her injuries.
In January 1993 when she first visited Dr. Berard, the plaintiff could not drive and was deprived of her mobility. She was unable to visit friends, shop and generally get around. She was unable to maintain the level of contact she enjoyed with her children, grandchildren and friends physically, was often emotionally unable to tolerate small children and other family members. The intimacy of her relationship with her husband had diminished.
Dr. Berard noted that Anna Broussard had been, before the fall at Wal-Mart, "a very courageous individual who basically did extremely well although she probably compensated for her physical limitations in all areas of her life." His opinion is that the plaintiff had never been depressed or experienced a major depressive syndrome at any time in her life before this fall. The depression caused by the injuries from the fall has resulted in the loss of pleasure in life in many areas where she used to have positive and rewarding experiences. She no longer enjoys working in her flower beds, vacationing with the family, the independence of driving her own car, and other recreational activities to which she once looked forward. She has developed a sleep disorder from the combination of pain and depression.
She began to improve psychologically in February 1993, responding to the depression medication prescribed by Dr. Berard. She improved continually as her ability to ambulate returned. They directly linked her psychological state to her physical improvement. Dr. Berard saw her for the last time in October 1993 because she could not afford the cost of continued visits. He thinks they much improve her, but that her psychological well-being is dependent on her physical health.
The defense had Dr. James McDaniel examine and evaluate the plaintiff. In his opinion, Anna Broussard has longstanding spondylolisthesis in her lower back, which is the more likely explanation for her symptoms. He bases this conclusion on the premise that her symptoms are intermittent, that they wax and wane. He feels that injuries from trauma hurt continuously until the damage heals and do not come and go. He does not believe that surgery would do her any good, and may even be harmful. In his view the fall may have *905 aggravated the plaintiff's many orthopedic problems, but those have healed by now.
The court, considering all of the evidence in this case, both medical and lay, finds that it must give more weight to the conclusions of the plaintiff's treating physician in this case. The court finds that the fall at Wal-Mart did, in fact, cause an aggravation of a preexisting condition, stenosis, and that the plaintiff's continuing symptoms are a result of that aggravation. The trauma of the fall caused the stenosis in the plaintiff's back to become symptomatic and is the cause of her present pain and disability.
Wal-Mart's argument that Anna's condition returned to its pre-accident state is based on the deposition testimony of Dr. Reavill, an anesthesiologist and pain management specialist. Dr. Reavill treated Anna with a series of steroidal epidural pain blocking injections which resulted in Anna being virtually pain free by October 1993. However, by the first part of 1994, Anna's pain symptoms returned to their pretreatment levels.
It is well settled that the fact-finder's conclusions concerning the cause, extent and duration of a claimant's injuries are factual determinations which are subject to the manifest error/clearly wrong standard of appellate review. Our thorough review of the record in this case indicates that the trial court's conclusion, that the fall caused Anna's stenosis to become symptomatic and resulted in "her present pain and disability," is a reasonable one. The trial court, in making a credibility determination, chose to give more weight to the testimony of Anna's treating physicians than the testimony of the independent medical examiner, Dr. McDaniel. The trial court could have reasonably determined that the pain management injections only provided Anna with temporary pain relief and that the pain returned when the effects of the injections wore off.

Special Damages
The discretion afforded the trial court in awarding special damages is, on appellate review, narrower or more limited than the discretion to award general damages. Some special damages such as medical expenses are easy to measure. A plaintiff must produce some evidence by which the special damage pleaded can be measured. Proof of a potential special damage is not sufficient to meet a plaintiff's burden. Eddy v. Litton, 586 So.2d 670 (La.App. 2 Cir.1991), writ denied, 590 So.2d 1203 (La.1992).
On review of the past and future medical expenses award, we find no abuse of discretion. The parties stipulated to the amount of past medical expenses incurred. The trial court's determination that the accident caused all of Anna's injuries, which we found was not manifestly erroneous, supports the award of $50,000.00 for future surgical expenses. Dr. Cobb testified at length concerning the complexity of this proposed spinal canal compression/disc fusion surgery and the cost involved. Although Dr. McDaniel disagreed with Dr. Cobb on the necessity of surgery and Anna's chances for success following surgery, we cannot conclude that the trial court manifestly erred in finding that the proposed surgery is necessary and related to Anna's injuries which were caused by the accident.
As discussed earlier in this opinion, because plaintiffs failed to specifically allege past loss of earning capacity, the trial court's allowance of evidence on this issue and award of damages was erroneous. The trial court determined that, based on the testimony of vocational rehabilitation specialist Jeffery Peterson, Anna was capable of earning $4.25 per hour or $170.00 per week at the time of her accident. However, she was earning only $35.00 per week as a part-time babysitter. The trial court awarded her $35.00 per week from May 3, 1992 to the end of 1992 and $170.00 per week from January 1993 to the date of trial, for a total of $25,726.40. The proper award under the circumstances was strictly one for past loss of wages of $35.00 per week from the date of the accident, May 3, 1992, to the date of trial, October 17, 1995. This amounts to $6,297.20, as testified to by plaintiffs' economist, Don Cornwell. We hereby reduce this award by $19,429.20 to $6,297.20.
*906 The trial court also awarded Anna $17,182.77 in future loss of earning capacity from the date of trial to two years following surgery. This award was based on (1) Dr. Cobb's estimation that Anna would be returned to her pre-accident physical state two years after surgery, and (2) economist Don Cornwell's calculation of the lost earning capacity for this period, based upon minimum wage. We conclude that plaintiffs proved this element of damages with sufficient specificity. This award was reasonable.
Wal-Mart also challenges the propriety of the trial court's award of $7,064.50 for the value of the loss of household services. This award was based on Anna's testimony that, prior to the accident, she performed all of the household services. This testimony was corroborated by that of her husband, Marion, who also said that, since the accident, he and his daughter-in-law, Lucinda Broussard, have been performing all of the household services. Lucinda testified that she performed heavy house cleaning of the Broussard's home once every two weeks from May 1992 to March 1995, when she and her husband moved. The Broussards paid her $20.00 every two weeks to perform this service.
Professor Cornwell testified that the total value of household services equaled $7,064.50. This total was made up of the time value, at minimum wage, of housekeeping from May 1992 to March 1995 ($1,572.50), meal preparation and cleanup ($3,469.00), shopping ($765.00), and laundry ($1,258.00).
Defendants offered no countervailing evidence to rebut the testimony of the Broussards and Professor Cornwell. Additionally, they did not attempt to discredit Professor Cornwell's calculations on cross-examination. Considering the evidence presented, we conclude that the trial court did not abuse its discretion in making this award.

General Damages
Wal-Mart maintains that the trial court abused its discretion in awarding what it describes as excessive damages for Anna's pain and suffering and Marion's loss of consortium.
The discretion to award general damages which is vested in the trier of fact is "`great,' and even vast, so that an appellate court should rarely disturb an award of general damages." Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1261 (La.1993), cert. denied, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994). On appeal, the initial inquiry is whether the award for the particular injuries and their effects on the particular injured person is a clear abuse of the "`much discretion' of the trier of fact." Id. at 1260.
Our review of the record in this case reveals that the trial court's awards of general damages to Anna and Marion did not constitute an abuse of its vast discretion. The extent, severity, and duration of Anna's injuries, and Marion's derivative consortium claim as documented by the trial court in written reasons, fully support these awards.

DECREE
For these reasons, the amount awarded in judgment by the trial court is reduced from $243,692.48 to $224,263.28. In all other respects, we affirm the judgment of the trial court. Costs of this appeal are assessed to appellant, Wal-Mart Stores, Inc.
AFFIRMED IN PART; REVERSED IN PART; RENDERED.
NOTES
[1] This statute was substantively amended by Act No. 8 of the First Extraordinary Legislative session of 1996, effective May 1, 1996.