917 So.2d 702 (2005)
Lavorn PETERS and Jackie Peters, Individually and on Behalf of their Minor Daughter, Raisa Peters, Plaintiff-Appellants
v.
Jerry W. WILLIAMS and City of Winnfield, Defendant-Appellees.
No. 40,403-CA.
Court of Appeal of Louisiana, Second Circuit.
December 14, 2005.
*704 Law Office of Darrel Ryland, by Darrel Ryland, Marksville, J.B. Treuting, for Appellants.
Keiser Law Firm, by Randall B. Keiser, Alexandria, for Appellees.
*705 Before BROWN, STEWART and MOORE, JJ.
MOORE, J.
The plaintiffs, Levorn Peters, his wife Jackie and daughter Raisa, appeal a judgment arising from a collision between Peters's pickup truck and a dump truck owned and operated by the City of Winnfield. Peters contends the district court erred in finding only a "minimal impact" and awarding only $20,323.99 in damages. The City of Winnfield and its driver, Jerry Williams, answer the appeal, contesting the allocation of fault, the awards of consortium to Peters's wife and daughter, and the assessment of costs. We affirm.

Factual Background
The accident occurred on Maple Street in Winnfield. On the afternoon of April 26, 2001, Williams was driving the city's International 3300 truck. He entered the Winnfield Kindergarten Center's U-shaped driveway, collected tree branches, and then exited the same way he came in, slowly pulling onto Maple Street. At that moment, Peters was driving west on Maple Street. He saw the large truck but did not brake or honk his horn; he assumed that it had fully stopped and was waiting for the road to clear. The truck did not stop, however, and entered the street, bumping into the right rear fender of Peters's Chevy half-ton pickup. According to Peters, the pickup "didn't spin around, but it shifted." As a result of the impact, Peters had to replace his right rear fender, right tail lamp assembly and rear bumper at the stipulated cost of $1,674.73.
Peters was employed as a shift supervisor at Trus Joist, an engineered lumber subsidiary of Weyerhauser in Natchitoches, but at the time of the accident he was on medical leave and seeing several doctors. In early April, he had seen Dr. Milton Eichmann, a urologist, for blood in the urine and low back pain; a CT scan indicated possible cancer. Seeking a second opinion, Peters went to Dr. Ratnam Nagalla, a general practitioner who had treated him for back, shoulder, arm and hand pain four months earlier. According to Peters, Dr. Nagalla diagnosed no cancer, only a kidney infection for which she prescribed antibiotics; two days before the accident, he returned to her office, again with blood in his urine. In mid-April, she also treated him for a lacerated finger. Peters also developed serious hemorrhoids; in late April he went to Dr. David Remedios, a general surgeon. Peters testified that Dr. Remedios performed a colonoscopy and rectal surgery shortly before the accident (the doctor's records show this was actually in early May). One day before the accident, Peters returned to Dr. Eichmann, complaining of recurrent blood in the urine and what the doctor noted as "new neck pain." Peters testified that because of the kidney infection, the lacerated finger and hemorrhoid surgery, he was off work about 90 days.
At the scene of the accident, Peters told the investigating officer he was not injured. The next day, however, he returned to Dr. Nagalla for "a lot of stiffness" from the auto accident; she prescribed an anti-inflammatory and a muscle relaxer. He went to Dr. Remedios on April 30 for hemorrhoids, and (according to the doctor's records) did not mention being in an auto accident four days earlier. Dr. Remedios performed a hemorrhoidectomy on May 3, gave him two prescriptions of narcotic pain medicine and monitored him for several weeks. In early June they discussed letting Peters return to work, and on June 13 Dr. Remedios gave him a full release with no restrictions.
*706 Peters testified, however, that the return to work made his neck problems worse, eventually with pain running down his left arm. On June 26, he went to Dr. Kenneth Lim, a chiropractor who had treated Peters for neck pain from an earlier auto accident in October 1996, and again for neck pain in August 2000, about eight months before the instant accident. Peters told Dr. Lim he had been in an auto accident on April 26 and since then had experienced intermittent neck stiffness, soreness or tightness in his trapezius muscles, headaches, sleep problems and thoracic spine pain. Dr. Lim ran X-rays that looked similar to those taken in 1996, and performed a series of adjustments. By late July, he felt Peters was 95% improved, and on August 13 released him as pain-free. Peters testified that the pain never fully subsided and was impairing his physically demanding work at Trus Joist.
Peters returned to Dr. Lim on September 21, reporting a "constant ache" in the left side of his neck and in his left trapezius down to the elbow. Peters's wife Jackie, who usually accompanied him on his doctor visits, testified that something happened at Dr. Lim's office "that made him realize he was hurting worse." This was his final visit with Dr. Lim. Three days later, he went to Dr. Nagalla chiefly for nausea and vomiting, but did report pain in his left shoulder and running down to his pinkie finger. On September 27, he returned to her for a general physical evaluation in which she certified he was in suitable health to adopt a child.
Still complaining of shoulder pain, on October 1 Peters returned to Dr. Remedios, who ordered two tests. The MRI showed focal disc herniation at C5-6 on the left side, consistent with his arm pain; the nerve conduction test showed mild compression of the ulnar nerve. Dr. Remedios then referred Peters to Dr. Lawrence Drerup, a neurosurgeon who prescribed a Medrol Dosepak but discussed the possibility of surgery. Peters sought second opinions from two orthopedists, Drs. Don Burt (who also gave him a Medrol Dosepak) and Carl Goodman; both recommended against surgery.
After November 9, Peters took off work to go hunting. While he was off, he began having "shooting pain" down his left arm. He returned to Dr. Drerup and decided to have the operation. Dr. Drerup performed an anterior cervical discectomy and fusion on November 16 and initially thought it was a success. However, by mid-December Peters was complaining of tingling in his left arm, followed by pain in both arms and soreness in his neck. Dr. Drerup prescribed narcotics which, according to Peters, did not resolve his pain. Peters complained that Dr. Drerup "copped out on me" in February 2002 and quit seeing him.
In the meantime, Peters sought treatment from Dr. Teresa Hamm, a family practitioner formerly in Winnfield, who gave him a series of shoulder injections and prescriptions for narcotics from November 2001 through February 2002. Peters also returned to Dr. Remedios in late December 2001 for pain down both his arms; this doctor also gave him narcotics and, in February 2002, a Medrol Dosepak. Dr. Remedios referred Peters to several other doctors. Dr. Louis Blanda, an orthopedic surgeon, treated him from March 2002 through July 2003, giving him a Dosepak and monthly prescriptions for narcotics. Dr. Edwin Urbi, a psychiatrist, treated him for depression from May 2002 through January 2004; Peters told Dr. Urbi his world "fell apart" because of the accident. Dr. Jonathan Forester, a general practitioner, treated him for fibromyalgia from May 2002 through December 2003, prescribing monthly refills of narcotics. *707 Dr. Blanda referred him to Dr. Daniel Hodges, a pain management physician, who saw him twice in late 2002 and prescribed narcotic pain medication. Also in late 2002, Dr. Blanda diagnosed carpal tunnel syndrome in both hands.
Drs. Remedios and Blanda were aware that Peters was seeing other physicians for his pain. The other physicians, however, were largely unaware that he was doing so, or that he was receiving Dosepaks, Hydrocodone, OxyContin, other narcotics, anti-depressants and sedatives simultaneously from several of them.

Action of the Trial Court
Peters filed the instant suit in January 2002 for his damages; his wife and daughter were listed as plaintiffs seeking lost consortium. The city moved in limine to exclude the testimony of Dr. Forester, regarding fibromyalgia, as inadmissible under Daubert v. Merrell Dow Pharm. Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). After a hearing on the second day of trial, the court granted this motion, a ruling not assigned as error; Dr. Forester testified by proffer as a general practitioner.
Trial was held in January and March 2004. Peters contended that before this accident, he was an energetic worker and model of good health with no significant medical history; after it, however, neck and back pain began and increased to a debilitating level, necessitating the discectomy and fusion in November 2001 as well as prospective carpal tunnel surgery and disabling him from ever working again. The city contended that Peters had neck and back problems long before the accident, which was only a minor impact resulting in minimal property damage and a soft-tissue injury of short duration. The city also argued that because Peters gave inconsistent statements to health care providers and apparently engaged in drug-seeking conduct, his claims of causation and injury were not credible.
The district court rendered detailed written reasons for judgment, describing the collision and finding the city 100% at fault. The court also summarized Peters's "extensive medical history involving ailments and injuries" prior to the accident. It found Peters and his wife entered a "medical marathon with the presentment of inaccurate medical histories" to physicians after the accident. Summarizing the medical evidence, the court found that Peters's initial treatment with Dr. Nagalla was related to the accident, and accepted Dr. Lim's assessment that Peters suffered accident-related pain until the visit of September 21, 2001, almost five months after the accident. However, the court found that Peters failed to report the accident to Dr. Remedios until six months after it occurred, and notably after he had denied any further symptoms to Dr. Nagalla. Referring to Drs. Drerup, Hamm and Blanda, who felt Peters had not given them an accurate history, the court declined to relate his subsequent physical and emotional problems to the accident. It concluded that Peters failed to prove a severe disc injury and permanent disability; at most, he proved a "moderate muscular injury."
The court awarded some of the expenses for Drs. Nagalla and Lim, $264.00 and $1,816.50 respectively, and pharmacy bills of $288.71, but disallowed all other medical claims and economic damages. The court awarded the stipulated property damages of $1,674.93 and replacement vehicle costs of $279.85. Finally, the court awarded general damages of $12,500 to Peters and lost consortium of $1,500 to Jackie; by supplemental reasons, it also awarded lost consortium of $2,000 to Raisa, who was 12 years old at the time of the accident.
*708 The judgment awarded the total of $20,323.99 and further recited, "All court costs are taxed to defendants, including the Cenla Court Reporter transcription fees for Dr. Nagalla and Dr. Lim, in the amount of $185.15."
Peters has appealed, urging by three assignments that the district court erred in failing to find that the accident caused his serious and permanent injuries, and in awarding inadequate damages. The city has answered the appeal, urging by three assignments that Peters should have been found partly at fault, that damages for loss of consortium are not warranted, and that the assessment of costs was in error.

Discussion: Causation
By his first two assignments of error, Peters contests the district court's failure to find causation. His first assignment urges the court erred in finding that only the right rear plastic fender of his pickup was damaged, when in fact the steel bumper was also "destroyed," thus undermining the idea that the impact was minimal. He concedes that force of impact is a valid criterion in determining causation and extent of injuries. Merrells v. State Farm, 33,404 (La.App. 2 Cir. 6/21/00), 764 So.2d 1182. He nevertheless contends that the court simply misapprehended the force of the collision, and this in turn "led to a finding of inaccurate histories given by Peters to his physicians."
His second assignment urges the court erred in failing to apply the presumption of causation described in Housley v. Cerise, 579 So.2d 973, 980 (La.1991):
A claimant's disability is presumed to have resulted from an accident if, before the accident the injured person was in good health, but commencing with the accident the symptoms of the disabling condition appear and continuously manifest themselves afterwards, providing that the medical evidence shows there to be a reasonable possibility of causal connection between the accident and the disabling condition.
Peters concedes that he had neck and back injuries in the past, but was "healthy and pain free at the time of the accident"; the urinary infection, hemorrhoids and other problems that left him temporarily disabled at the time of the accident had no bearing on the serious back and neck injury and ensuing depression that resulted from this accident. He contends that the city failed to rebut the presumption by showing that anything else caused his injuries. Maranto v. Goodyear Tire & Rubber Co., 94-2603 (La.2/20/95), 650 So.2d 757. He further contends that he conclusively showed medical causation, citing the testimony of Dr. Lim and the "earlier testimony" of Drs. Blanda and Drerup. He concedes that on cross-examination, both Drs. Blanda and Drerup retracted their opinion of causation, but only "after hypotheticals regarding over-medication, other accidents and delay in the onset of symptoms were presented to these physicians." Because of these inaccurate and misleading questions, Peters urges the court should disregard the responses they elicited. Finally, Peters suggests that "a finding on the issue of causation is not necessarily contingent upon the substance of the expert medical testimony." Greening v. Bell, 28,689 (La.App. 2 Cir. 9/25/96), 36, 38, 681 So.2d 36.
The city responds that the district court's findings are not plainly wrong. It urges that appellate courts routinely deem a property damage assessment to be competent lay testimony regarding force of impact. See, e.g., Harper v. Garcia, 32,142 (La.App. 2 Cir. 8/18/99), 739 So.2d 996; Merrells v. State Farm, supra. The city strongly urges the Housley presumption did not apply because of Peters's significant *709 prior medical problems and because six of his treating physicians (Drs. Remedios, Drerup, Blanda, Hamm, Urbi and Nagalla) all declined to find causation once they learned his full medical history. It submits that the court properly questioned Peters's credibility and was not plainly wrong to find he was "doctor shopping" as was the claimant in Sparks v. Insurance Co. of North Amer., 35,479 (La.App. 2 Cir. 12/5/01), 803 So.2d 329.
In a personal injury suit, the plaintiff bears the burden of proving a causal relationship between the injury sustained and the accident which caused the injury. Maranto v. Goodyear Tire & Rubber, supra; Bradshaw v. Brookshire Grocery Co., 38,960 (La.App. 2 Cir. 10/27/04), 886 So.2d 623. Proof must be by a preponderance of the evidence. Maranto v. Goodyear Tire & Rubber, supra. The test for determining the causal relationship is whether the plaintiff proved through medical testimony that it is more probable than not that the subsequent injuries were caused by the accident. Id. To obtain the benefit of the presumption of causation described in Housley v. Cerise, supra, the plaintiff must show (1) that he was in good health prior to the accident at issue, (2) that subsequent to the accident, symptoms of the alleged injury appeared and continuously manifested themselves afterward, and (3) through evidence, either medical, circumstantial, or common knowledge, a reasonable possibility of causation between the accident and the claimed injury. Juneau v. Strawmyer, 94-0903 (La.App. 4 Cir. 12/15/94), 647 So.2d 1294.
A trial court's finding of fact may not be reversed absent manifest error or unless clearly wrong. Stobart v. State, 617 So.2d 880 (La.1993). The issue to be resolved by the reviewing court is not whether the trier of fact was right or wrong, but whether its conclusion was a reasonable one. Miller v. Clout, XXXX-XXXX (La.10/21/03), 857 So.2d 458. Reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review where conflict exists in the testimony. Miller v. Clout, supra; Rosell v. ESCO, 549 So.2d 840 (La.1989).
The root issue is whether the district court committed manifest error. The court accepted the opinions of Drs. Nagalla and Lim, at least in part. Dr. Nagalla, who considered herself Peters's primary physician, had treated him for shoulder, back and neck pain just months before the accident. She did not express a view as to whether his current complaints were caused by the accident, but by September 24 his neurological exam was "normal" with only general soreness. Dr. Lim had given him chiropractic manipulations in 1996 for back and neck aches, and in 2000 for stiffness and tightness in the neck and arms. After this accident he treated Peters for stiffness and aching; by July 30 he considered him 95% healed and on August 13 he released him. During this time Peters never complained of back pain to his other treating physician, Dr. Remedios, who released him for work on June 13. Notably, Peters's wife testified that "something happened" at Dr. Lim's office on September 21 to make him realize he was hurt worse; she did not elaborate. Based on this evidence, the court was within its discretion to find that the accident caused a moderate muscular injury of about five months' duration.
Beyond that, however, the medical evidence is conflicting and generally unfavorable to Peters. Dr. Remedios, who treated him from April 2001 through July 2003, refused to state that the accident caused his chronic symptoms. Dr. Lim, whom Peters visited for the final time on September 21, 2001, testified the accident was the "only thing" to which he could relate *710 the radiating pain reported for the first time that day. As Peters contends, Drs. Drerup and Blanda initially stated that the accident caused the C5-6 herniation, but then they equivocated. We do not agree that their change of mind came from counterfactual or misleading hypothetical questions. Dr. Drerup was mildly indignant to learn, apparently for the first time in deposition, that Peters was getting treatment and narcotics from other doctors while getting the same from Dr. Drerup. In perhaps more measured tones, Dr. Blanda admitted the same information affected his view of the patient's credibility, and that secondary gain, drug seeking and other motivations may have been in play. On this record, we simply cannot say the district court was plainly wrong to accept these doctors' later (and better informed) opinion that the accident did not cause the herniated disc.
As for Peters's further complaints, there is virtually no evidence to link them to the accident. Peters told Dr. Urbi, the treating psychiatrist, that his mental problems started with the accident, but Dr. Urbi felt that Peters had "little insight" into his own condition. He concluded the accident was only one of many stressors affecting Peters; he specifically noted that taking Oxy-Contin is associated with depression. Dr. Paul Ware, a psychiatrist who conducted an independent medical examination at the city's request, also found no causation between the accident and mental problems. Dr. Drerup was emphatic that Peters's carpal tunnel and ulnar nerve conditions, which did not appear until December 2002, were not caused by the accident.
Against this unfavorable medical evidence is Peters's testimony. It is not disputed that he was a vigorous and achieving worker at various paper mills in central Louisiana and in Minnesota. He maintained that before the accident, he never had serious, disabling back pain; but with the accident, the pain began, continued and grew, resulting in a herniated disc, severe depression, and wrecking his life. The district court, however, questioned his credibility, and a few examples will suffice to illustrate the issue. Peters directly told Dr. Drerup he was pain-free before the accident, and did not advise Dr. Blanda of any pre-accident back problems;[1] however, medical records show at least two prior bouts of neck and back problems serious enough to require medical attention, three disability claim applications in the 4½ years prior to this accident, and a complaint of "new" back pain to Dr. Eichmann one day before the accident. Peters insisted that when he returned to work in mid-June, he was in pain and could not perform at 100%; one coworker, Mitchel, corroborated this, but he was not aware that Peters had been in an auto accident. The plant superintendent, Gordon, and the press department manager, Berry, did not recall that Peters complained of pain, and Peters did not advise the human resources manager, Benefield, of the accident until late November 2001. Peters received a host of narcotics and other medications from many doctors simultaneously, creating an inference of drug seeking and doctor shopping. He attempted to explain this by bringing to court a large box of unused pills, and by showing that some of the prescriptions from Dr. Hamm may have been actually used by Jackie. On this record, we will not disturb the district court's credibility call. Rosell v. ESCO, supra.
*711 The record justifies the district court's refusal to apply Housley presumption of causation. The evidence is questionable whether Peters was in "good health" before the accident, and there is insufficient evidence, both medical and circumstantial, that it caused anything more than a soft-tissue injury of about five months' duration. Juneau v. Strawmyer, supra. Peters's second assignment of error lacks merit.
As for the first assignment of error, the record justifies the court's finding of a "minimal impact." Williams testified he made contact about one foot into the street, while not accelerating; this is consistent with Peters's impression that the dump truck had stopped at the end of the kindergarten's driveway. The repair estimate of $1,674.73 suggests a relatively minor collision. The body shop manager, Franklin, testified that although the entire bumper had to be removed, the inner fender was not damaged, and the final repair bill was actually only $1,528.77. The district court was not plainly wrong to find a minimal impact associated with soft-tissue injury of about five months' duration. The first assignment of error lacks merit. The district court's findings regarding causation are affirmed.

Damages
By his third assignment of error, Peters urges the damages awarded by the district court are inadequate to compensate him and his family for the damages they sustained in the accident. In support he cites his expert vocational rehabilitation counselor, Dr. Richard Galloway, who testified that with his disability and limited education, Peters will not be able to return to the workforce. He also cites his expert economist, Dr. Randy Rice, who calculated impressive figures for lost wages and benefits, lost earning capacity and future medical expenses. He requests general damages of $250,000 to $400,000 for his neck injury, and $50,000 to $100,000 for his carpal tunnel syndrome, depression and other health problems. American Motorist Ins. Co. v. American Rent-All Inc., 579 So.2d 429 (La.1991); Jenkins v. Kerr-McGee Corp., 613 So.2d 1097 (La.App. 3 Cir.), writs denied, 616 So.2d 701, 702 (1993).[2] He concedes, however, that if he has not adequately shown the trial court's manifest error regarding causation, this assignment is "superfluous."
We agree that a review of the general and special damages is largely superfluous in light of our findings regarding causation. Of the manifold physical and emotional ailments alleged, only very few were shown to have resulted from the accident. The award of general damages is left to the "much discretion" of the judge or jury. La. C.C. art. 2324.1; Clement v. Frey, 95-1119 (La.1/16/96), 666 So.2d 607. For a muscular injury of five months' duration, the general damages of $12,500 are clearly within the court's discretion. Fletcher v. Simmons, 37,758 (La.App. 2 Cir. 10/29/03), 859 So.2d 292; Ice v. Dry Klean Carpet Maint. Co., 03-0525 (La.App. 4 Cir. 12/3/03), 863 So.2d 596, writ denied, XXXX-XXXX (La.4/8/04), 870 So.2d 277. This assignment of error lacks merit.

Allocation of Fault
By its first assignment of error, the city urges the district court erred in allocating 100% fault to Williams. It contends that Peters saw the dump truck emerging from the driveway but chose to ignore it. It also disputes Peters's testimony that he swerved to avoid the truck, *712 as Peters did not mention this to the investigating officer. The city contends that Peters breached his duty to slow down or otherwise avoid the hazard ahead. Edwards v. Horstman, 96-1403 (La.2/25/97), 687 So.2d 1007. Without elaboration, the city suggests that Williams's fault should not exceed 25%.
Peters responds that Williams admitted not seeing the pickup truck until he collided with it, and this supports the finding of negligence. Peters also contends that Williams failed to yield, in violation of La. R.S. 32:124, and that a motorist who stops before entering a favored street, and then proceeds into the path of an oncoming vehicle, is guilty of gross negligence. Ruttley v. Lee, 99-1130 (La.App. 5 Cir. 5/17/00), 761 So.2d 777, writ denied, XXXX-XXXX (La.9/22/00), 768 So.2d 1287; see also Toston v. Pardon, XXXX-XXXX (La.4/23/04), 874 So.2d 791.
The manifest error rule applies to the factfinder's allocation of fault. Theriot v. Lasseigne, 93-2661 (La.7/5/94), 640 So.2d 1305. The record shows that Williams drove the city's dump truck the wrong way out of the kindergarten driveway, stopped, and then entered Maple Street before the traffic had cleared. He testified that Maple Street had the right of way and there was no visual obstruction; he candidly admitted, "I just didn't see him." By contrast, Peters saw the dump truck stop and reasonably expected it would wait until traffic passed before entering the street. He also testified that he swerved at the last minute, thereby limiting the property damage to his bumper and right rear fender. Considering the duties and conduct of both parties, we find no manifest error in assigning all fault to Williams. This assignment of error lacks merit.

Loss of Consortium
By its second assignment of error, the city urges the district court erred in awarding any consortium. It concedes that the awards of $1,500 to Jackie and $2,000 to Raisa are de minimis but urges that neither offered any proof of her loss. It also cites the court's finding that Jackie abetted her husband in doctor shopping.
Peters contends that the court properly found losses, but inadequately valued them. He suggests that these awards should be raised to $20,000 for Raisa and $25,000 for Jackie.
The compensable elements of a claim for loss of consortium of a spouse include loss of love and affection, loss of companionship, loss of material services, loss of support, loss of aid and assistance, and loss of felicity. Ferrell v. Fireman's Fund Ins. Co., 96-3028 (La.7/1/97), 696 So.2d 569. The elements of the child's claim are the same except for any component of sexual relations. Moore v. Safeway Inc., 95-1552 (La.App. 1 Cir. 11/21/96), 700 So.2d 831, writs denied, 1997-2921, 709 So.2d 735, XXXX-XXXX (La.2/6/98), 709 So.2d 744.
Jackie testified, without contradiction, that after this accident, Peters became withdrawn and alienated from his family; he is no longer intimate with her, and they physically separated in August 2003. Raisa testified that her dad is no longer available to talk about her problems, help her keep her animals or go fishing. The district court was not plainly wrong to find these are compensable losses of consortium. The court explicitly found that Jackie's award must be offset by her participation in Peters's doctor shopping, and implicitly recognized that both awards must reflect that only a small portion of Peters's injury claims resulted from the accident. On this record, the awards of $1,500 and $2,000 are no abuse of discretion, *713 either too high or too low. These assignments of error lack merit.

Costs
By its third assignment of error, the city urges the district court erred in casting it with 100% of costs. The city submits that its portion of costs should mirror Williams's share of fault in causing the accident, and admits that if the fault allocation is affirmed, the costs cannot be altered. Peters responds that the court complied with La. C.C.P. art.1920, "costs shall be paid by the party cast," and did not abuse its discretion.
Since we have found no basis to disturb the allocation of fault, we will likewise not disturb the allocation of costs. We note further that at a hearing on December 21, 2004, the date of rendition, the court stated:
They submitted a stipulatedan agreed upon judgment. And what I think they put in there was that they made an agreement that all costs would be paid by the defendant. The defendant, I think, agreed to pay all costs. All court costs anyway. That was [what] the dispute was all about.
Counsel for the city did not object. Under the circumstances, this assignment of error lacks merit.

Conclusion
For the reasons expressed, the judgment is affirmed. Each side is to bear its own appellate costs. In accordance with La. R.S. 13:5112, the city's appellate costs are fixed at $118.50.
AFFIRMED.
NOTES
[1] He also told a physical therapist, "Before all this stuff happened I had never been to a doctor." Peters's functional capacity examination of October 9, 2003 with Eugene Noel Jr. was videotaped and introduced as Exhibit D-10.
[2] Peters also contends that loss of consortium should be increased for both Jackie and Raisa, but we will address this item of special damages with the city's second assignment of error.