PEATROSS, J.
_|_1In this tort action against Walgreen Louisiana Co., Inc. (“Walgreens”) for damages allegedly sustained by Bridget and Oscar Gober’s minor daughter, Emily, as the result of a mis-filled prescription of the diuretic Lasix, the jury found Walgreens liable and awarded damages in the amount of $35,000. Specifically, the jury found that the Gobers failed to prove that the mis-filled prescription was the cause of Emily’s long-term neurocognitive dysfunction; rather, the damages awarded were for the short-term dehydration symptoms suffered by Emily from the overdose. The Gobers appeal, arguing that it was reversible error for the judge to refuse to charge the jury with the Housley presumption, infra, which could have allowed the jury to presume causation. Finding no manifest error in the trial judge’s determination that the presumption was inapplicable and, thus, no error in the jury charge as given, we affirm.

FACTS

Emily Gober was born prematurely on September 16, 1999. She suffered from pulmonary atresia, meaning that she had no pulmonary valve connecting her heart and lungs. She was in NICU at Tulane for four months following her birth, where shunts were placed to create a conduit from her heart to her lungs. Emily required speech and physical therapy, but did not have neurocognitive problems. In 2001, Emily received an artificial pulmonary valve. The surgery was successful and without complication. On May 2, 2008, at age 8, since she had grown physically, Emily underwent a second pulmonary valve replacement. Again, the surgery was a success with no complications.
|2Following the surgery of May 2, 2008, cardiologist Dr. Robert Ascuitto prescribed Emily a low dose of Lasix, a mild diuretic, to prevent fluid buildup and retention around the heart and lungs. The prescribed dosage was 8 ml. twice a day. The pharmacist at Walgreens mis-filled the prescription, resulting in Emily receiving five times the prescribed amount of Lasix beginning on the evening of May 12, 2008. Walgreens conceded that the prescription was mis-filled.
During the following weeks, Emily showed signs of weakness and lethargy and the Gobers contacted Dr. Ascuitto by phone advising him that “something was not right.” Dr. Ascuitto saw Emily on May 23, 2008. At that time, Emily should have had 160 ml. of Lasix, but she had *11 ingested 960 ml. due to the mis-filled prescription. The Gobers testified that Emily was exhibiting cracked lips, excessive urination, excessive fluid consumption, confusion, sunken eyes and altered mental state. During the examination by Dr. Ascuitto, however, Emily’s vital signs, including her electrolytes, were within normal limits. Her weight was slightly down from her pre-operative weight. Dr. Ascuitto ordered discontinuation of the Lasix and reh-ydration at home, advising the family to make sure that Emily drank fluids.
Ten days later, the Gobers took Emily to the pediatrician with no complaints of mental or neuroeognitive problems. Two and one-half months later, on August 7, 2008, Emily saw neurologist Dr. Aristó-teles Pena-Miches. At this time, the Gob-ers complained of Emily’s mental slowness and altered mental state. Dr. Pena recommended a psychologist Revaluation and follow-up by him in three weeks; however, the record does not reflect that the Gobers followed either of these recommendations. Ten months later, and after suit was filed, the Gobers returned to Dr. Pena with complaints of Emily’s regressed mental acuity. Testing, however, showed cognitive functioning to be normal, with a diagnosis of Attention Deficit Disorder.
On November 19, 2008, the Gobers, individually and on behalf of Emily, filed the instant suit for damages against the pharmacist and Walgreens. There was no dispute that Emily had experienced some degree of neuroeognitive impairment and Walgreens conceded that the pharmacist mis-filled the prescription. Thus, the sole issue at trial was causation.
During a two-week trial, the Gober family, including Bridget and Oscar and Emily’s grandmother and sister, along with school personnel, testified regarding Emily’s decline in academic/cognitive function. According to the testimony, Emily’s symptoms included short-term memory loss, inability to focus, decline in study habits and sharp decline in academic performance. The family testified that the change in Emily was an abrupt occurrence that coincided with the overdose of Lasix. The family further testified, and Emily’s math teacher and tutor corroborated that, after the May 2 surgery, Emily had trouble learning and retaining concepts and that Emily was often in a “fog” or “glazed over.”
Dr. Ascuitto testified as to the dehydration. His notes indicate that, in September 2009, he reported to Emily’s pediatrician that the episode of dehydration she had suffered from the Lasix overdose was entirely resolved. [ 4He noted that Emily was experiencing trouble in school and was in a special class and that there may be ADD concerns. He further noted that cognitive dysfunction is a “universal situation” found in patients that have undergone multiple complex cardiac repairs. Dr. Ascuitto deferred to the treating neurologist for an opinion on cause of the neurological deficits experienced by Emily.
Dr. Pena also testified. He opined that the neuroeognitive problems were caused by an acute event. Dr. Pena stated that the acute event was not the surgery because she had quickly recovered her cognitive functions after both surgeries. Had the cause been the surgery, the problems would have manifested within 72 hours of the surgery. Dr. Pena related Emily’s sudden brain dysfunction to the overdose of Lasix. In his opinion, Emily suffered from isonatremic dehydration, an episode of dehydration which attacked the brain and central nervous system. He further opined that this condition is permanent; Emily would likely graduate from high school with assistance, but would not be able to complete higher levels of education.
*12 The Gobers also presented two additional non-treating expert witnesses who described the symptoms of dehydration suffered by Emily and that she suffered a brain injury from some external cause.
Walgreens presented expert testimony regarding potential alternative causes of the onset of Emily’s neurological dysfunction. The three experts to testify on behalf of Walgreens were Dr. Robert Marshall, pediatric critical care physician and pharmacologist, Dr. Gil Wernovsky, pediatric cardiologist, and Dr. Gary Clark, pediatric neurologist. Each of these | ¿doctors testified that the mild dehydration experienced by Emily was not the cause of her brain dysfunction. Several other likely causes were presented by Wal-greens’ experts, including the heart defect itself, the stroke Emily suffered as an infant, the multiple hypoxic episodes she suffered in the NICU and the multiple cardiac procedures she underwent in her first eight years of life, including the surgery of May 2, 2008.
At issue is the trial judge’s decision not to include the instruction known as the The Housley presumption, which provides as follows:
In determining the causal relationship between the incident and subsequent injury, plaintiff must: (1) prove that she was in good health, or free of certain symptoms, prior to the incident allegedly causing the plaintiffs injury; (2) show that subsequent to the incident, symptoms of the alleged injury appeared and continuously manifested themselves after the incident; and, (3) demonstrate through medical evidence, circumstantial evidence or common knowledge, that there was a reasonable possibility of causation between the incident and the alleged injury.
If the plaintiff can show these three elements, then plaintiff is entitled to a presumption of causation and the burden of proof shifts to the defendant to prove some other particular incident could have caused the injury complained of.
If the plaintiff cannot show these three elements, the plaintiff is not entitled to a presumption of causation and the burden of proof does not shift to the defendant.
Housley v. Cerise, 579 So.2d 973 (La.1991); Lucas v. Insurance Company of North America, 342 So.2d 591 (La.1977).
Walgreens objected to the inclusion of the Housley presumption, arguing that there was competing evidence of causation to be presented; and, thus, the Housley presumption was not applicable. After hearing argument and accepting memoran-da, as previously stated, the trial judge opted not to include the Housley presumption in the jury charge, and instructed the jury |(jWith the usual tort/negligence law and the preponderance of the evidence burden of proof.
As previously stated, the jury found Walgreens liable for the short-term damages suffered by Emily due to the dehydration from the overdose and awarded $35,000 in damages. The jury further found that the long-term neurocognitive damages were not caused by the overdose of Lasix. This appeal by the Gobers ensued.

DISCUSSION

The sole issue before us is whether the trial judge correctly charged the jury, ie., whether or not it was error for the trial judge to refuse to include the Housley presumption in the jury charge. We find no error in the charge to the jury in this case.
In a personal injury suit, the plaintiff bears the burden of proving a causal relationship between the injury sus *13 tained and the accident which caused the injury. Maranto v. Goodyear Tire & Rubber, 94-2603 (La.2/20/95), 650 So.2d 757; Bradshaw v. Brookshire Grocery Co., 38,960 (La.App.2d Cir.10/27/04), 886 So.2d 623. Proof must be by a preponderance of the evidence. Maranto v. Goodyear Tire & Rubber, supra. The test for determining the causal relationship is whether the plaintiff proved through medical testimony that it is more probable than not that the subsequent injuries were caused by the accident. Id.
To obtain the benefit of the presumption of causation described in Hous-ley v. Cerise, supra, the plaintiff must show (1) that he was in good health prior to the accident at issue, (2) that subsequent to the accident, |7symptoms of the alleged injury appeared and continuously manifested themselves afterward and (3) through evidence, either medical, circumstantial or common knowledge, a reasonable possibility of causation between the accident and the claimed injury. Peters v. Williams, 40,403 (La.App.2d Cir.12/14/05), 917 So.2d 702. The application of this presumption to the facts is a question of fact subject to manifest error review. Littleton v. Richardson Medical Center, 42,082 (La.App.2d Cir.4/4/07), 954 So.2d 812, citing Detraz v. Lee, 05-1263 (La.1/17/07), 950 So.2d 557. In Littleton, this court found no manifest error in the OWC’s refusal to allow the claimant the benefit of the Housley presumption where there was conflicting medical evidence about whether there was a reasonable possibility of causal connection between the accident and the disabling condition. In that case, there was “evenly balanced” evidence presented by the claimant and the employer regarding the cause of claimant’s condition. Thus, the claimant was not entitled to the presumption of causation.
Likewise, in the case sub judice, there was medical testimony presented regarding the cause of Emily’s neurocognitive dysfunction from both the Gobers and Walgreens. The Gobers relied on the testimony of Dr. Pena that the overdose of Lasix resulted in isonatremic dehydration which affected her brain and central nervous system. Dr. Pena further testified that this severe dehydration caused the “catastrophic cognitive injury” sustained by Emily. We note that this positive evidence of | ¡^causation, in the absence of any contradictory testimony, would itself obviate the need for the Housley presumption.
Even if the presumption were applicable, however, Walgreens presented three experts who testified as to various other probable causes of Emily’s neurological condition. Dr. Marshall, clinical pharmacologist, opined that he has given the increased dose of Lasix ingested by Emily to other critically ill pediatric patients following similar surgeries. He further testified that Lasix does not affect the brain; rather, the greatest risk of neurological damage is found in the exposure to surgical procedures such as Emily’s second complex heart procedure. Dr. Marshall further testified that the neurological deficits from such procedures can manifest immediately after the procedure or later. Next, Dr. Wernovsky testified that children with heart defects are at greater risk for developing neurocognitive deficiencies. Like Dr. Marshall, Dr. Wernovsky has prescribed the dosage of Lasix ingested by Emily without incident. He testified that, in his opinion as a pediatric cardiologist, the Lasix was not the cause of Emily’s injury. Third, neurologist Dr. Clark testified that Emily was only mildly dehydrated by the overdose of Lasix and that the most likely cause of Emily’s cognitive problems was that she had undergone multiple bypass procedures. Finally, we note that, while Emily’s cardiologist, Dr. Ascuitto, testified that he defers to the neurologist regarding the cause of her *14 neurocognitive problems, in his September 2009 report to her pediatrician, he opined that her cognitive dysfunction was most likely a result of the May 2008 surgery. As previously mentioned, Dr. Ascuitto further noted in |flthat report that such problems seem to be a “universal situation” following multiple complex cardiac repairs.
In light of the above-described conflicting evidence regarding causation of Emily’s long-term neurocognitive dysfunction, we find no manifest error in the trial judge’s decision not to include the Housley presumption in the jury charge. Littleton v. Richardson Medical Center, supra.

CONCLUSION

For the foregoing reasons, the judgment of the trial court is affirmed at the cost of Plaintiffs Bridget Gober and Oscar Gober, Individually and on behalf of their minor daughter, Emily Gober.
AFFIRMED.
APPLICATION FOR REHEARING
Before BROWN, STEWART, GASKINS, CARAWAY & PEATROSS, JJ.
Rehearing denied.